Marion **AITCHISON**, individually and on behalf of Michael Aitchison and Janice Aitchison, her children, and on behalf of all other persons similarly situated, Plaintiffs,

v.

Stephen **BERGER**, individually and as Commissioner of the Department of Social Services of the State of New York and Noah Weinberg, individually and as Commissioner of the Department of Social Services of Rockland County, New York, Defendants.

**No. 75 Civ. 1224.**

United States District Court,
S. D. New York.

Nov. 12, 1975.

Rene H. Reixach, Greater Up-State Law Project Monroe County Legal Assistance Corp., Rochester, N.Y., Douglas

J. Good, Alton L. Abramowitz, Rockland County Legal Aid Society, New City, N. Y., for plaintiffs.

Louis J. Lefkowitz, Atty. Gen., New York City, for State defendants; Judith A. Gordon, New York City, of counsel.

Diana W. Rivet, John B. Franklin, New City, N.Y., for defendant Noah Weinberg.

FRANKEL, District Judge.

Ten years ago, Congress enacted Title XIX of the Social Security Act, 42 U.S.C. §§ 1396–1396g, the so-called "Medicaid" legislation. Medicaid is a cooperative federal-state medical assistance program operated under state direction, subject to extensive federal statutory and regulatory guidelines. States are not required to participate in Medicaid, nor, if they do participate, to extend benefits to any persons other than those receiving federally-funded public assistance—sometimes referred to by responsible officials (and hereinafter) as "categorical assistance."[1] If, however, a State decides to participate in Medicaid, it must submit a plan that comports with federal law. If the plan includes aid for people not receiving categorical assistance but qualifying as "medically needy,"[2] the State must observe the additional federal requirements applicable to this group of recipients.[3]

New York has elected to participate in the Medicaid Program and to extend benefits to the medically needy.[4] The basic issues now before the court are whether New York's statutory and regulatory scheme setting income eligibility and retention levels for the medically needy[5] are compatible with applicable federal regulations,[6] and, if not, whether these federal regulations are themselves inconsistent with the Social Security Act.[7]

The plaintiffs are the wife and child of a disabled 54-year-old man who has been in a nursing home since 1972 and receiving medical assistance since October 17, 1974. As a medically needy "family" of two,[8] plaintiffs, under New York's medical assistance law, are allowed to retain a total of $317 per month for their personal maintenance expenses. The monthly standard of need for a family of two receiving categorical assistance, living in the same county and paying the same rent as plaintiffs, is $370 per month. Thus, plaintiffs are allowed to retain $53 less a month for their maintenance than the comparable public assistance standard of need for a family of two.

The discrepancy results from a difference in computing shelter allowances. For ADC recipients, these allowances are based upon actual rents paid. For the medically needy family, the allowance has nothing to do with the family's actual rent. It is instead based on a figure computed from statewide

---

1. 42 U.S.C. § 1396a(a)(10)(A) (1970). The federally-funded public assistance programs now in effect are the Aid to Families with Dependent Children Program ("ADC") and the Supplemental Security Income Program ("SSI") for the aged, blind, and disabled.

2. "An individual is considered to be medically needy if he has income and resources which exceed the amount of income and resources allowed to the categorically needy but which are insufficient to meet the costs of necessary medical and remedial care and services." 45 C.F.R. § 248.1(a)(2).

3. See 42 U.S.C. § 1396a(a)(10)(C).

4. New York Social Services Law ("NYSSL") §§ 363–a, 366 (McKinney Supp.1974–75).

5. NYSSL § 366(2)(a)(8); New York Codes, Rules and Regulations ("NYCRR") §§ 360.5 and 360.7.

6. Primarily, 45 C.F.R. § 248.3(c)(1) and (2) (1974).

7. Primarily, 42 U.S.C. § 1396a(a)(17).

8. The parties have stipulated that when this action began, plaintiffs were a family of three, but are now a family of two. For purposes of determining family size for income maintenance and eligibility purposes, a family member in chronic care "shall not be deemed to be a member of any household." NYCRR § 360.5(e).

averages, which may be above or below actual rent. For the class of plaintiffs before us it is, of course, below.

To spell out these arrangements, which are not evident from the face of the State's Medicaid statute and regulations: Under the ADC provisions, each family of the same size receives a basic allowance of the same amount, plus an allowance for shelter based upon actual rent paid up to the maximum set for shelter in a given family's social service district (county). For example, a family of two eligible for ADC receives a basic monthly allowance of $150; if the family lives in Rockland County and pays $250 a month rent, as plaintiffs do, it is entitled to a monthly shelter allowance of $220, the maximum allowed in Rockland County. Thus, the total monthly public assistance standard of need for a family comparable to plaintiffs' in size, county of residence, and shelter costs, is $370.[9]

To arrive at the medical assistance income levels, defendants average the shelter allowances paid to all ADC families of a given size and divide by the number of those families. The resulting "mean shelter allowance" is then added to the basic allowance to determine the income allowance for a family of that size.[10] Thus, some medically needy families are entitled to retain more, others less maintenance income than they would be paid if they were without any income and paid cash benefits under ADC. The crucial variable is shelter cost, more specifically, whether a given family's shelter costs exceed the shelter average.

Plaintiffs contend that this differential violates federal regulations. They seek to represent a class consisting of all persons in New York receiving medical assistance who are allowed to retain income for maintenance in an amount less than the applicable standard of need under New York's public assistance programs.[11]

Seeking declaratory and injunctive relief, plaintiffs assert rights under 42 U.S.C. § 1983, the Social Security Act, regulations promulgated thereunder, and the supremacy and equal protection clauses of the Constitution. They invoke the court's jurisdiction under 28 U.S.C. §§ 1331(a), and 1343(3) and (4). They seek to maintain the suit as a class action under Fed.R.Civ.P. 23(b)(2). Plaintiffs have moved upon affidavits and a series of stipulations subsequently submitted for (1) a declaration that this is a proper class action and (2) summary judgment on their claim that the maintenance income levels of section 366(2)(a)(8) of the New York Social Services Law and accompanying regulations,[12] as applied to the plaintiff class, violate 45 C.F.R. § 248.3(c). Defendants cross-move to dismiss the complaint for lack of jurisdiction. There do not appear to be any material issues of fact. For the reasons stated below, both of plaintiffs' motions are granted.

### Jurisdiction

Jurisdiction in welfare cases is a recurrent issue, regularly resolved for plaintiffs.[13] Since the court concludes that plaintiffs' equal protection

---

9. See NYSSL § 131–a(2) and (3); NYCRR § 352.2(e); 1975 Table of Local Agency Maximum Shelter Allowances with Heat, Exhibit A of Affidavit of Eleanor A. Sochocki, sworn to October 3, 1975.

10. Since the resulting figure for individuals and families of two is even lower than the SSI payment standard for individuals and two-person families, the SSI standard is used as the income retention level for these medically needy people. Federal law requires a State to set its income maintenance levels, for individuals and families of two, at

the higher of the SSI and ADC payment standards. 45 C.F.R. § 248.3(c)(1)(ii)(B). See note 23 infra.

11. The two relevant state public assistance programs are contained in NYSSL §§ 345 through 358–c ("ADC") and §§ 207–212 ("SSI").

12. NYCRR §§ 360.5(e) and 360.7(a)(5).

13. But cf. Andrews v. Maher, 525 F.2d 113 (2d Cir. 1975).

claim is not "wholly insubstantial" or "obviously frivolous," as those phrases have been construed by the Supreme Court,[14] jurisdiction exists under 28 U. S.C. § 1343(3) and there is no need to explore in detail the alternative jurisdictional bases asserted by plaintiffs. See *Schaak v. Schmidt*, 344 F.Supp. 99, 102–03 (E.D.Wisc.1971). Suffice it to say that jurisdiction may also exist under 28 U.S.C. § 1331(a),[15] but apparently not under the other asserted provisions.[16] This court can pass upon plaintiffs' "statutory" claims without deciding whether a three-judge court should be convened to decide the merits of plaintiffs' equal protection claim.[17]

### Class Action Motion

■ The question of class action treatment can also be dealt with summarily. Plaintiffs seek to represent all medically needy persons in New York who are required by defendants, pursuant to state statute and regulations, to live on a monthly income allowance which is below the level of need for categorial assistance families of the same size, living in the same county, and paying the same rent. This is a classic case for treatment as a class action under Fed.R.Civ.P. 23(b)(2). See, e.g., *Almenares v. Wyman*, 334 F.Supp. 512, 518–19 (S.D.N.Y.1971), *modified* 453 F. 2d 1075 (2d Cir. 1972); *Wilczynski v. Harder*, 323 F.Supp. 509, 512 n. 3 (D. Conn.1971); *Schaak v. Schmidt, supra* at 104. Defendants' argument that plaintiffs have failed to identify sufficiently the members of the class might carry some weight if this were a (b)(3) class action where notice had to be given to class members. But it seems clear that there is no such requirement here. See *Frost v. Weinberger*, 515 F.2d 57, 65 (2d Cir. 1975).

### Inconsistency Between State and Federal Law

■ While the issue is a difficult one, the court has concluded that the income levels in New York's medical assistance statute and regulations do not conform with the requirements of 45 C. F.R. § 248.3(c).

45 C.F.R. § 248.3(c)(1) requires that a state plan covering the medically needy "[p]rovide levels of income * * * for maintenance, in total dollar amounts, as a basis for establishing financial eligibility for medical assistance." The income levels referred to "must be, as a minimum, at the higher of the levels of the payment standards generally used as a measure of financial eligibility in the money payment [categorical assistance] programs * * *." 45 C.F.R. § 248.3(c)(1)(ii). For fami-

---

14. See, e. g., *Hagans v. Lavine*, 415 U.S. 528, 536–43, 94 S.Ct. 1372, 39 L.Ed.2d 577 (1974); *Edelman v. Jordan*, 415 U.S. 651, 653 n. 1, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974) (processing the claims of some applicants for welfare aid before those of similarly situated plaintiffs raises a not "wholly insubstantial" equal protection claim).

15. The parties have stipulated that defendants administer a medical assistance fund of some $3,000,000,000 and that if plaintiffs are successful in this action, the financial impact on the state medical assistance budget will be in excess of $10,000. Thus, plaintiffs' claims arguably satisfy the $10,000 jurisdictional amount requirement of 28 U.S.C. § 1331(a). See, e. g., *Bass v. Rockefeller*, 331 F.Supp. 945 (S.D.N.Y.), appeal dismissed as moot, 464 F.2d 1300 (2d Cir. 1971); *Yanez v. Jones*, 361 F.Supp. 701, 706 (D.Utah 1973); *Moore v. Betit*, 511 F.2d 1004, 1007

n. 12 (2d Cir. 1975). See also *Committee for GI Rights v. Callaway*, 518 F.2d 466, 472–73 (D.C.Cir. 1975).

Plaintiffs may also satisfy the monetary requirement when it is viewed from the standpoint of future medical assistance payments. Cf. *Moore v. Betit, supra* at 1006.

16. Although the Supreme Court has left open the issues of whether all supremacy clause and § 1983 claims are cognizable under 28 U.S.C. §§ 1343(3) and/or (4), the Second Circuit has, at least temporarily, resolved those same issues against jurisdiction. See *Andrews v. Maher, supra*.

17. See, e. g., *Hagans v. Lavine, supra* 415 U.S. at 543–45, 94 S.Ct. 1372; *Cordova v. Reed*, 521 F.2d 621 at 625 (2d Cir. 1975).

Plaintiffs stated at oral argument that they would move to convene a three-judge court if the motion for summary judgment on their "statutory" claim is denied.

lies of three or more, the income level is to be at the level of the payment standard under a State's ADC program "generally applied." For individuals and families of two, the income level is to be at the ADC payment standard "generally applied" or at the level of payments "generally available" under the SSI program, whichever is higher. Finally, the income of the medically needy must be applied "[f]irst, for maintenance, so that any income in an amount at or below the established level will be protected for maintenance" before any income may be applied to defray the costs of medical assistance. 45 C.F.R. § 248.3(c)(2).[18]

The corresponding state law is found in NYSSL § 366(2)(a)(8)[19] and NYC RR §§ 360.5(e)[20] and 360.7(a)(5).[21] These provisions set forth levels of income, in total dollar amounts, which serve both as a basis for establishing eligibility for medical assistance and as the level of income that may be retained for personal maintenance expenses by eligible medical assistance recipients.[22]

18. While the crux of plaintiffs' attack is on subdivision (1) of § 248.3(c), subdivision (2) is, in all strictness, more directly relevant since its concern is how much of a medically needy family's income can be "taken" to defray the costs of medical assistance. Subdivision (1) concerns itself with levels of income for eligibility purposes. None of the members of the class are complaining that they are not eligible for medical assistance because of unlawful income levels. Thus, subdivision (1) is only derivatively relevant to plaintiffs' case; that is, to construe "established level" in subdivision (2) requires interpreting subdivision (1) to see if the established level comports with the minimum requirements there.

19. "The following income * * * shall be exempt and shall neither be taken into consideration nor require to be applied toward the payment or part payment of the cost of medical care and services * * *. (8) income in an amount set forth in the following schedule:

"**Annual net income—Number of family members in a household and family members for whom they are legally responsible or have assumed responsibility**

| One | Two | Three | Four | Five | Six | Seven |
|-----|-----|-------|------|------|-----|-------|
| $2,500 | $3,400 | $4,000 | $5,000 | $5,700 | $6,400 | $7,200 |
| [$2,700] | [$3,800] | [$4,200] | [$5,000] | [$5,800] | [$6,500] | [$7,400] |

"**Such income exemptions shall be increased by six [seven] hundred dollars for each member of a family household in excess of seven.**"

Figures in brackets show the amount of exempt income as of October 1, 1975, to reflect recent amendments of § 366(2)(a)(8).

20. The same income allowances specified in NYSSL § 366(2)(a)(8) appear in this regulation, which dictates how much of the "excess income" of a person in a medical institution can be "given" to his family for maintenance expenses. This is the relevant section when the medically needy family's income falls short of the allowance level and the hospitalized member of the family has income to contribute to the family. of a hospitalized person has income in excess of the income allowance level. Any income in excess of the appropriate level is to be contributed to the medical expenses of the hospitalized member. NYCRR § 360.-7(a)(5).

The overall effect of NYSSL § 366(2)(a)(8) and NYCRR §§ 360.5 and 360.7 is to set the level of maintenance income that a medically needy family is allowed to live on.

21. Again, the same income allowances appear in this regulation as those specified in NYSSL § 366(2)(a)(8). This regulation, rather than § 360.5, applies when the spouse

22. Thus, for example, a family of two with a net available income of $3,500 and medical expenses of $99 would not be eligible for medical assistance because their income ex- .

Thus, New York law complies with the introductory sentence of 45 C.F.R. § 248.3(c)(1) by specifying "levels of income * * * for maintenance, in total dollar amounts, as a basis for establishing financial eligibility for medical assistance." The problems begin in subsequent subdivisions of the federal rule.

Subdivision (ii) of 45 C.F.R. § 248.3(c)(1) requires that the levels of income set be, "as a minimum, at the higher levels of the payment standards generally used as a measure of financial eligibility in the money payment programs [i.e., the ADC standard generally applied]." [23] It is undisputed, or in any event obvious, that plaintiffs and an undetermined number of other medical assistance recipients are allowed to retain less income for maintenance than they would receive for maintenance if they were categorically needy (i.e., eligible for ADC assistance). Plaintiffs contend that this difference in level of maintenance income violates the requirement of § 248.3(c)(1)(ii) that maintenance income be set, as a minimum, at the level of the applicable ADC payment standard. Defendants counter that § 248.3(c)(1)(ii) requires that the income levels be set at or above the ADC "payment standard generally applied" and that there is no such standard in New York's ADC assistance scheme other than that found in NYSSL § 366(2)(a)(8) and its accompanying regulations.

Under New York's ADC program, need is determined and benefits paid on a partially variable rather than totally flat grant basis. That is, for each family size, the standard of need, and identical payment standard,[24] consists of (1) a basic allowance in an amount equal for all families of a given size and (2) an allowance for shelter that varies from county to county and from family to family depending on the actual shelter costs incurred and the established county maximum.[25] Hence, defendants argue that there is no ADC payment standard "generally applied" and that the actual ADC payment "standard" could not possibly be used as the medical assistance eligibility standard because it is not expressed in "total or flat dollar amounts."

The argument is thin as semantics and no more robust as a matter or legal reasoning. It is not correct in any relevant sense to say that New York lacks any ADC payment standard "generally applied" and that the "total dollar

---

ceeds the $3,400 level specified in the statute and regulations. Another family of two with net available income of $5,000 and medical expenses of $5,000 would be allowed to retain $3,400 for maintenance expenses and required to contribute the remaining $1,600 to the cost of medical assistance.

23. The defendants maintain that for a family of two, the payment standard under SSI (a flat grant system) is higher than the "ADC payment standard" (the standard computed under defendant's averaging methodology discussed below). Because the court rejects defendants' route to an assertedly valid ADC payment standard, and it is conceded that a family of two living in Rockland County and paying the same rent as plaintiffs would receive more under ADC than under the SSI program, the ADC program has the higher payment standard. For the remainder of this discussion, therefore, the amount of ADC payments will be considered the higher payment standard.

24. In some States, only a specified percentage of a family's standard of need is actually

paid. See *Rosado v. Wyman*, 397 U.S. 397, 408–09, 90 S.Ct. 1207, 25 L.Ed.2d 442 (1970). In New York, 100% of the standard of need is paid out in benefits. Thus, the standard of need and the payment standard are identical in New York's ADC program. See NYSSL § 131–a(3).

25. "The following schedule shall be the standard of monthly need for determining eligibility for all categories of assistance in and by all social services districts:

**Number of Persons in Household**

| One | Two | Three | Four | Five | Six |
|-----|-----|-------|------|------|-----|
| $94 | $150 | $200 | $258 | $318 | $368 |

"For each additional needy person in the household there shall be added an additional amount of fifty dollars monthly.
"In addition to the above, the standard of need shall include amounts for shelter and fuel for heating * * *." NYSSL § 131–a(2).

amounts" language of 45 C.F.R. § 248.-3(c)(1) necessarily requires that the medical assistance standard be expressed in flat dollar amounts.

The composite need formula of NYSSL § 131–a is New York's ADC payment standard.[26] That the application of this standard to families of the same size results in different amounts of need and corresponding grants does not vitiate it as a standard "generally applied." The legal world is filled with generally applicable standards that produce varying individual results because of varying individual circumstances responding to the material (and general) criteria.

Defendants' reading of "total dollar amounts" to preclude the use of the ADC methodology as the medical assistance standard is, similarly, a dry, scarcely inevitable, unpersuasive construction. It is true, as defendants say, that the "total dollar amounts" language of 45 C.F.R. § 248.3(c)(1) was adopted to implement the "reasonable standards" language of 42 U.S.C. § 1396a(a)(17)[27] and that this statutory provision was meant to ensure that the states adopted efficient methods of determining eligibility for medical assistance.[28] It is also true that NYSSL § 366(2)(a)(8), as would be true of any standard set in flat dollar amounts, is an efficient method of determining eligibility. But it does not follow at all from these two flawless premises that no variable standard can satisfy the "total dollar amounts" requirement because such a standard is not expressed in flat dollar amounts.

The "total dollar amounts" language, fairly read in light of its purpose, merely calls for an objective, efficient standard for determining eligibility.[29] Such a standard could either be expressed in flat dollar amounts, as in NYSSL § 366(2)(a)(8), or be readily reducible to flat dollar amounts as is the actual ADC standard in NYSSL § 131–a.[30] Indeed, New York apparently agreed with this broader reading when it read very similar language in the ADC eligibility regulation[31] to allow it to adopt the variable standard now found in NYSSL § 131–a.

In spite of the existence of an actual ADC standard, defendants claim that NYSSL § 366(2)(a)(8) represents New York's only "ADC payment standard generally applied." This disputed provision was created for the purpose of setting income allowances for the medically needy. As described above, the figures in that provision were arrived at by

---

26. Id.

27. "A State plan for medical assistance must —* * * include reasonable standards (which shall be comparable for all groups and may, in accordance with standards prescribed by the Secretary, differ with respect to income levels, based on the variations between shelter costs in urban areas and in rural areas) for determining eligibility for and the extent of medical assistance under the plan which * * * are consistent with the objectives of this subchapter * * *." 42 U.S.C. § 1396a(a)(17).

28. See note 39 infra.

29. To be sure, an eligibility standard entailing cumbersome calculations and lengthy investigations would be out of step with the simplification philosophy of 42 U.S.C. § 1396a(a)(17) and 45 C.F.R. § 248.3(c)(1). But the ADC methodology is not such a standard. A family's shelter cost, up to the appropriate county maximum, can be ascer-

tained with fair ease. As shown by the State's Budget Worksheet for Medical Assistance (Form DSS 517), each social service district must review and verify each claimant's assets and income before passing on his eligibility. Having applicants list their shelter costs and investigating the listed amount should not substantially increase the administrative task. Cf. Shapiro v. Thompson, 394 U.S. 618, 636, 89 S.Ct. 1322, 22 L.Ed.2d 600 (1969).

30. See 2 CCH Medicare and Medicaid Guide ¶ 15,600, at 6558 (Michigan's medical assistance eligibility standard is expressed as a formula).

31. The federal ADC eligibility regulation requires that the eligibility standard be expressed in "money amounts." 45 C.F.R. § 233.20(a)(2). New York obviously did not view this language as a bar to setting up a variable ADC standard as evidenced by NYSSL § 131–a.

(1) allegedly[32] averaging the shelter allowances paid to all families of a given size receiving categorical assistance and (2) adding that average to the appropriate basic allowance.

This ad hoc "ADC payment standard" does not mesh acceptably with 45 C.F.R. § 248.3(c)(1). To determine whether a State's medical assistance standard is high enough, the federal regulation requires that it be compared with the "generally used" public assistance eligibility standard. Defendants' synthetic ADC standard, used to determine eligibility for medical rather than categorical assistance, cannot be compared with itself to test its own adequacy. When matched with the proper (i. e., actual) ADC standard, the artificial ADC standard, as the embodiment of the medical assistance eligibility standard, is sometimes adequate, sometimes not, as in the case of the class members before us. Despite the obvious incompatibility of their artificial standard with the requirements of the federal regulation, defendants insist that the "generally used" language sanctions their averaging methodology.

There is no sound basis for defendants' textual argument that the "generally used" language of 45 C.F.R. § 248.3 (c)(1)(ii) means or can mean a hypothetical "average" ADC payment standard.[33] As a matter of English, defendants' reading is hard to accept. New York's "average ADC standard" is never used, let alone generally used, as the ADC payment standard. That standard is found in NYSSL § 131–a. The fairer use of the federal phrase would seem to be, as plaintiffs suggest, to contrast the general ADC standard with occasional departures from that standard made to take care of special needs[34] and/or to take cognizance of the fact that some individuals were "grandfathered" into the SSI program even though they did not meet the generally used standard of SSI eligibility.[35]

In further support of their textual argument, defendants find significance in a change in the language from a predecessor regulation that required medical assistance eligibility standards to be set "at the levels of the most liberal money payment standard used by the State * * *." 45 C.F.R. § 248.21(a)(3) (i)(B). It seems plain, however, that the change in language was not intended to effect any substantive change, but was made merely to reflect the amalgamation of Titles I, X, XIV, and XVI of the Social Security Act into a new Title XVI (the SSI program). Thus, it no longer made sense to talk about the most liberal money payment stand-

---

**32.** Plaintiffs contend that the income levels in NYSSL § 366(2)(a)(8) do not accurately reflect statewide shelter allowances even as increased effective October 1, 1975. The parties were to proceed to discovery on this issue if the court denied plaintiffs' summary judgment motion.

**33.** The parties do not cite, and the court has not found, any direct learning on the intended meaning of the phrase "generally used." We do know that an early draft of 45 C.F. R. § 248.3(c)(1) did not contain the "generally used" language at all. The draft specified that the medical assistance eligibility standard was to be, "as a minimum, at the level of the payment standard used as a measure of financial eligibility in the appropriate money payment program * * *." 38 Fed.Reg. 32219 (1973). The "generally used" language was added in response to comments that the draft language incorrectly

implied that separate standards governed the aged, blind and disabled and families with dependent children. 39 Fed.Reg. 9512 (1974). The evolution of the phrase defendants invoke further demonstrates, if it is necessary, the fallaciousness of their reasoning from it.

**34.** Many States, including New York, pay some welfare recipients more than the amount dictated by the generally applied payment standard for unusual or "special" expenses. See, e. g., NYSSL § 131–a(6).

**35.** Certain individuals who received aid under Titles I, X, XIV, or old XVI of the Social Security Act as of December 1973, were deemed to be eligible for SSI payments, notwithstanding incomes or resources exceeding the new eligibility level under SSI. 42 U.S. C. § 1382(g).

ard when there were only two such standards remaining, ADC and SSI. Hence, the language was changed to "the higher of * * *." In Puerto Rico, Guam, and the Virgin Islands, where SSI did not go into effect, the "most liberal" language was retained.[36]

Defendants' next argue that HEW's approval of New York's medical assistance plan demonstrates its validity. While HEW approval is some evidence of validity, it is not controlling.[37] It is not more than slightly persuasive when, as here, the so-called approval does not appear to have followed explicit attention to the question now confronted. All that appears on the face of New York's medical assistance plan and NYSSL § 366(2)(a)(8) are income amounts with no indication of how these figures were arrived at or whether they are at, below, or above the ADC payment standard. The "averaging" technique is only discovered after specific exploration. Furthermore, HEW has recently notified New York, in a quarterly compliance report, that its cash assistance payment standards are impermissibly higher than its medical assistance standards. This casts doubt upon the latter standards, if not upon the underlying averaging methodology as such.[38]

This court concludes, as have other courts in closely analogous cases, that the State standard of care for its medically needy is in conflict with the governing federal regulations. See *Dominguez v. Milliken*, CCH Medicare and Medicaid Guide ¶ 26,633 (W.D.Mich. 1973); *Schaak v. Schmidt, supra; Schlemowitz v. Lavine*, 75 Misc.2d 529, 347 N.Y.S.2d 133 (Sup.Ct. Nassau Co. 1973). Unless those regulations are themselves invalid, plaintiffs must prevail.

### *Validity of 45 C.F.R. § 248.3(c)*

Defendants argue that if plaintiffs' interpretation of 45 C.F.R. § 248.3(c) is adopted, as it now has been, then the regulation is inconsistent with, and thus invalid under, 42 U.S.C. § 1396a(a)(17). For the reasons stated below, the court has concluded that the regulation is valid.

45 C.F.R. § 248.3(c) was apparently derived from 42 U.S.C. § 1396a (a)(17),[39] which requires state plans to "include reasonable standards * * * for determining eligibility for and the extent of medical assistance. * * *" Pertinent legislative history and administrative interpretation indicate that the "reasonable standards" language encompasses at least two concepts: (1) regulatory simplicity [40] and (2) income levels set at or above the subsistence level under public assistance

36. 45 C.F.R. § 248.21(a)(3)(i)(B) still applies to Puerto Rico, Guam, and the Virgin Islands.

37. See, e. g., *Almenares v. Wyman*, 334 F. Supp. 512 (S.D.N.Y.), aff'd 453 F.2d 1075, 1087 (2d Cir. 1971), cert. denied, 405 U.S. 944, 92 S.Ct. 962, 30 L.Ed.2d 815 (1972); *Rosado v. Wyman*, 397 U.S. 397, 406, 90 S. Ct. 1207, 25 L.Ed.2d 442 (1970).

38. The HEW Compliance Report for the Quarter ending March 31, 1975, contains the following section:

| "Medical Services Program | Medically Needy Level |
|---|---|
| 45 CFR 248.3(c)(1)(ii)(B) (2) Section 1903(f)(1) (B)(i) SSA | Due to a series of factors, the cash assistance stnds. have become more liberal than the MA standards for most family sizes." |

It is conceivable that HEW's criticism merely relates to the fact that New York's medical assistance standards have become too low in view of the gradual increase in shelter allowances under the cash assistance programs. Thus it may be that HEW is calling for an updating of the levels set in NYSSL § 366(2)(a)(8).

39. 42 U.S.C. § 1396a(a)(10)(C)(i) arguably provides additional statutory authority for 45 C.F.R. § 248.3(c). See *Dominguez v. Milliken, supra* at 9119–21.

40. Referring to the "reasonable standards" language, the Report of the House Ways and Means Committee states in part:
"* * * the State plan must include such safeguards as may be necessary to assure that eligibility * * * will be determined * * * in a manner consistent with simplicity of administration and the best interests of the recipient.

programs.[41] By requiring eligibility standards to be in "total dollar amounts" and at the level of the higher payment standard used in a State's money payment programs, 45 C.F.R. § 248.3 (c) embodies both of these aims.

Defendants argue that 42 U.S.C. § 1396a(a)(17) allows the states to formulate their own eligibility standards so long as they are "reasonable." Since New York's averaging methodology and resulting eligibility standards are said to constitute "reasonable standards," defendants urge the court to uphold the state statutory and regulatory scheme notwithstanding any contrary mandate in 45 C.F.R. § 248.3(c). Assuming *arguendo* that New York's eligibility standards are reasonable, that fact is irrelevant. The relevant inquiry is whether the federal regulation itself is a reasonable interpretation of 42 U.S.C. § 1396a(a)(17). See, e.g., *Edelman v. Jordan*, 415 U.S. 651, 660 n. 8, 94 S.Ct. 1347, 39 L.Ed.2d 662 (1974). This court, like others before it, concludes that it is. See *Dominguez v. Milliken, supra* at 9121 (upholding 45 C.F.R. § 248.21); *Schaak v. Schmidt, supra* at 103–04 (upholding 45 C.F.R. § 248.21). Even if this were a contest as to which is more reasonable, the federal

regulation would prevail. The programs in question are for real people with real needs, not statistical averages. Construing the legal documents liberally in favor of the needy,[42] it makes eminent sense to read the standards in terms of every individual or family, not to hold that it is sufficient if some average is accomplished.

To discriminate against the self-supporting by requiring them to live on income below the level declared by New York to be necessary for minimal maintenance would do violence to the aims of the Medicaid legislation and common sense. Our concern here is with people who have not sought public assistance for routine support, but only to meet the catastrophe of serious illness. The court could not countenance for an instant the mean-spirited fiction that people driven to seek public assistance are somehow unworthy or undeserving. Nevertheless, it remains deep and familiar in our esteem for individual initiative that we would not deem it acceptable without some particular justification to treat those outside categorical assistance groups less generously than those within.[43] The questioned regulation, fairly read, reflects this philosophy. No

This provision was included in order to provide some assurance that the States will not use unduly complicated methods of determining eligibility which have the effect of delaying in an unwarranted fashion the decision on eligibility for medical assistance. * * * [U]nder this provision, the States will be eliminating unrewarding and unproductive policies and methods of investigation * * *."
H.R.Rep.No.213, 89th Cong., 1st Sess. 66 (1965).

41. The following passage indicates that Congress intended that the medically needy not be forced to live below the applicable public assistance subsistence level:
"In no event * * * may a State require the use of income or resources which would bring the individual's income below the amount established as the test of eligibility under the State plan. Such action would reduce the individual below

the level determined by the State as necessary for his maintenance."
S.Rep.No.404, 1 U.S.Code Cong & Admin. News 1943, 2019 (1965). See also HEW Handbook of Public Assistance Administration, Supp.D. § D–4240(A)(2) (1966).

42. See, e. g., *Haberman v. Finch*, 418 F.2d 664, 667 (2d Cir. 1969); *Gold v. HEW*, 463 F.2d 38, 41 (2d Cir. 1972).

43. See these observations in the course of hearings on Medicaid legislation by George K. Wyman, a former New York Commissioner of Social Services:
"The major cause of dependency in the United States is illness. Everyone agrees that the 'poorest of the poor,' those who receive public assistance, should have their medical care needs met. Also, most people believe we should prevent dependency if at all possible. Therefore it makes good, common sense to help those persons who

good reason appears either for reading it differently or holding it invalid.

It may be noted, finally, that today's decision, on defendants' own analysis, does not entail any inevitable increase in the State's Medicaid outlays. Those who pay less than average shelter allowances for rent have in a sense been receiving windfalls. Nobody supposes these extra benefits are compelled as a matter of federal law or regulation. This court holds only that those disadvantaged by the Procrustean average are entitled individually to the concrete benefits of the federally mandated standards.

Having concluded that NYSSL § 366(2)(a)(8) and NYCRR §§ 360.5 and 360.7 are incompatible with 45 C.F. R. § 248.3(c) and that the federal regulation is valid, the court (1) declares the state statute and regulations invalid as applied to class members, (2) will enjoin defendants from enforcing these provisions against class members, and (3) will order defendants to compute the entitlements of class members on the basis hereinabove outlined, namely, to protect for maintenance amounts no less than those allowed to comparable ADC recipients.

Settle a final decree on notice.

are able to support themselves with food, clothing, and shelter but who need assistance with their medical care bills. This means we should help the workingman who is faced with a sizable medical bill, in order that he will not have to mortgage his home, sell his car, or go into debt, in order to pay the medical obligation, or, even worse, deplete himself of his resources to the point where he becomes a welfare recipient."

Hearings on H.R. 12080 Before the Senate Finance Committee, 90th Cong., 1st Sess., pt. 3, at 1547 (1967).