OPINION OF THE COURT
Beatrice S. Burstein, J.
This case, apparently one of first impression, involves the scope of a Federal statute and regulation and a counterpart State regulation, each of which essentially requires that payments received from Medicaid by a provider of services shall be accepted as payment in full.
Plaintiff seeks summary judgment, pursuant to CPLR 3212, claiming there are no issues of fact, or, in the alternative, for an order dismissing defendants’ affirmative defenses, pursuant to CPLR 3211 (subd [b]), on the ground they have no merit. Defendants cross-move for an order, pursuant to CPLR 3025 (subd [b]), granting them leave to amend their answer so as to assert the affirmative defense of payment, and based thereon, they seek an order dismissing plaintiff’s complaint, pursuant to CPLR 3211 (subd [a], par 5). Leave to amend is granted. The court thereby deems the answer amended so as to include a seventh affirmative defense of payment, as set forth in the *785 proposed amended answer contained in the cross-moving papers. The court now considers whether either summary judgment or the dismissal defendants seek will lie.
The following facts are uncontroverted. Plaintiff operates a private licensed nursing home and, at all relevant times, was a participant in what is commonly known as the Medicaid program.
Defendant Margaret Snook is a patient in plaintiff’s nursing home. Prior to her admittance, plaintiff’s representative met with her son, defendant Robert Snook (hereinafter defendant). The representative avers, on personal knowledge, that defendant said he would prefer to pay more to have his mother in a private room rather than a semiprivate room. At that time, defendant Margaret Snook was not receiving any public assistance. Three days later, on July 10, 1982, Margaret Snook entered the home as a private patient. On that date, defendant signed an agreement as “Sponsor”, which provided, inter alia, that:
“1. The Glengariff Corporation hereby admits the Patient to the Facility. In consideration, the Patient and Sponsor agree to pay The Glengariff Corporation its basic charge for the basic facility services furnished (itemized in the following paragraph 2) at the current daily basic rate of $95.60 for a private room, or at such increased basic rate that shall comply with paragraph 6 below * * *
“Patient and Sponsor acknowledge and agree that the Glengariff Corporation is not obligated to accept Medicaid payments in lieu of the private payments from the Patient and Sponsor required hereunder unless and until (a) the Patient shall have been a patient in the Facility for a period of at least 18 months and (b) the Patient and Sponsor shall have paid in full all sums due The Glengariff Corporation hereunder from the Patient and Sponsor for all periods prior to the first actual receipt of such Medicaid payments and shall have performed in full all of the obligations under this agreement on their part to be performed during such periods. The Glengariff Corporation will credit against the sums due The Glengariff Corporation hereunder from the Patient and Sponsor any reimbursements actually received from Medicare for Facility services and items furnished by The Glengariff Corporation to the Patient”. *786 Defendant paid for the period July 10, 1982 through September 30, 1982. Then he ceased making payments. His security deposit was applied by plaintiff and therefore plaintiff was actually paid by defendant through November 24, 1982.
On October 8, 1982, defendant made application for Medicaid on his mother’s behalf. Initially this was refused, apparently on the ground that she was not in need of medical assistance because defendant had agreed to pay for her care. He appealed. Following a fair hearing, the denial was found improper, and the Nassau County Department of Social Services (DSS) was directed to provide assistance retroactive to November 24, 1982, the date when defendant’s security payments were exhausted.
The decision after fair hearing states that as defendant ceased making payments on the patient’s behalf, and as he cannot be required to do so pursuant to the Social Services Law, his funds cannot be considered an available resource to the patient. The decision further states that DSS can explore the feasibility of requiring defendant Margaret Snook to pursue “a third-party cause of action” against defendant on the basis that the agreement between plaintiff and defendant herein is a potentially available resource under “section 360.4(a)” presumably 18 NYCRR 360.4 (a). This regulation requires as a condition of eligibility that a Medicaid recipient pursue any potential resource not currently available. Apparently no action was ever taken in that regard by DSS. The specific question before this court now is whether defendant is still obligated on the agreement either for the difference between the sums the plaintiff received from Medicaid for the care of Margaret Snook and the amount defendant agreed to pay for her care for 18 months, or the entire amount (in which case plaintiff would reimburse Medicaid for its share).
Medicaid is a joint Federal-State grant-in-aid program, which was established pursuant to section 1396 et seq. of title 42 of the United States Code, commonly known as the Federal Security Act. (Matter of Westhampton Nursing Home v Whalen, 67 AD2d 1017, revd on other grounds 60 NY2d 711.) Through this co-operative venture, the Federal Government supplies funds to State programs run in accor *787 dance with Federal requirements. (Aitchison v Berger, 404 F Supp 1137,1141.) A privately owned and operated nursing home which provides services to persons eligible to receive Medicaid (such as plaintiff’s) is reimbursed according to rates established by the New York State Department of Health pursuant to the procedure set forth in section 2807 of the Public Health Law. (Hurlbut v Whalen, 58 AD2d 311.) In order to receive the benefits of the Medicaid program, including reimbursements, plaintiff was required to sign a “Provider Agreement” with New York State (Matter of Westhampton Nursing Home v Whalen, 67 AD2d 1017, revd on other grounds 60 NY2d 711, supra) and, of course, generally is bound by various relevant statutes and regulations.
In opposition to plaintiff’s motion for summary judgment, defendants rely upon certain of those statutes and regulations. They claim the agreement is void, as a matter of law, on the grounds it is contrary to Federal and State law and public policy, and that plaintiff’s receipt of payment from Medicaid constitutes full payment, beyond which it is not entitled to recover. One such statute is section 2805-f of the Public Health Law, which, in subdivision 4, essentially classifies the knowing and willful act of charging more for services provided a Medicaid recipient than is received from Medicaid as a class E felony. However, that subdivision did not become effective until the thirtieth day after July 22,1982. (L 1982, ch 716, § 1.) This was more than a month after plaintiff and defendant entered into the agreement at issue. Therefore, the statute does not specifically govern plaintiff’s acts. (Goldfarb v Goldfarb, 86 AD2d 459; Kinney v Kinney, 48 AD2d 1002; City of Troy Unit of Rensselaer County Ch. of Civ. Serv. Employees Assn. v City of Troy, 36 AD2d 145, 147, affd 30 NY2d 549.)
There is also a Federal statute, set forth at section 1396h (subd [d], par [2], cl [B]) of title 42 of the United States Code, the relevant part of which became effective in 1977. It classifies the knowing and willful charging of money to others as a requirement for a Medicaid patient’s continued stay in a nursing home as a felony, punishable by a fine of not more than $25,000 or imprisonment for not more than *788 five years, or both. Thus, a nursing home operator who required monetary “supplements” from nonfinancially responsible relatives of patients for whom it received Medicaid reimbursement could be found guilty under the cited section. (United States v Zacher, 586 F2d 912 [dicta].) A violation of this statute occurs whenever a provider of services charges in excess of rates established by the State. (Smith v Caggiano, 12 Mass App 41,_, n 4, 421 NE2d 473, 475, n 4.)
In addition, there are Federal and State regulations which address the issue now before the court. These regulations have the force of law (Matter of Bates v Toia, 45 NY2d 460; Matter of Berent [County of Erie], 86 AD2d 764; Matter of Fairchild v Gretch, 80 AD2d 724), and the Federal regulation is binding upon the States (Flathead Health Center v County of Flathead, 183 Mont 211, 215).
“A State plan must provide that the Medicaid agency must limit participation in the Medicaid program to providers who accept, as payment in full, the amounts paid by the agency.” (42 CFR 447.15.)
The State regulation, which is set forth at 18 NYCRR 360.27, was enacted pursuant to section 34 (subd 3, par [f]) of the Social Services Law, which requires the Commissioner of the Department of Social Services to establish regulations for the administration of public assistance and care within this State. It states, in relevant part: “Each social services district shall require that payment of fees and rates made in accordance with established schedules, including that portion which is required to be paid by the recipient, shall constitute payment in full for the services or supplies furnished recipients of medical assistance.”
The only case known to this court which addresses these rules in a context somewhat similar to the instant case arose in Minnesota. The State of Minnesota has a rule not unlike that of New York, requiring providers of service to accept as payment in full the amounts received from the State for patients who are recipients of medical assistance (Minnesota’s counterpart to Medicaid, referred to hereinafter as M.A.).*
*789 In Resident v Noot (305 NW2d 311 [Minn]) plaintiff was a 96-year-old nursing home resident, who qualified for medical assistance and was assigned to a double room. Her daughter, who was not financially responsible for her, wanted to pay the nursing home an additional sum, so as to provide plaintiff with a private room, as she stated, so that her mother “can live her last years in greater comfort and with more dignity”. There was no medical need for such provision. The daughter offered to pay the nursing home the difference between its daily charge for the private room and the M.A. reimbursement rate for a double room. The nursing home refused the payments. Plaintiff then sought a judicial declaration that her daughter could supplement her benefits in order to pay for a private room, and that that supplement would not affect her status as a Medicaid recipient. Reviewing the history of Medicaid on the Federal level, the court concluded that the Minnesota rule “prohibits nursing homes from soliciting payments for an M.A. recipient, her relatives or friends for M.A. covered items. The rule is directed toward controlling the conduct of the nursing homes, not toward restricting the generosity of the relatives and friends of an M.A. recipient.” (305 NW2d, at p 314.) Based upon this, the court declared that the rule did not prohibit the nursing home from receiving voluntary payments for non-M.A. covered items and services.
The instant case is distinguishable. Here defendant does not wish to contribute to the cost of extras for his mother’s care, and no one is seeking to restrict any generosity on his part. While he may initially have requested a private room, he is not in court asking to be permitted to make payments for it, and according to paragraph 21 of the amended complaint, his mother was assigned to a semiprivate room as of November 5,1982. Rather, it is the nursing home which is now seeking extra payments from him. The court in Resident (supra) clearly stated such solicitation was prohibited by the rule.
*790 However, this case has one additional factor which must be considered — the contract. The fact that there is a statute or regulation in conflict with the terms of a contract does not necessarily render the contract void automatically, for a party may waive a rule of law or a statute or even a constitutional provision enacted for his or her benefit or protection, so long as only a private right is involved. (Selzer v Baker, 295 NY 145; Matter of Cook, 244 NY 63.) The same rule does not apply when the right or benefit waived is based upon public policy considerations which negatively affect the public interest. Such rights may not be waived. (Matter of Abramovich v Board of Educ., 62 AD2d 252, affd 46 NY2d 450, cert den 444 US 845; see Estro Chem. Co. v Falk, 303 NY 83; Matter of Allerton Constr. Corp. v Fairway Apts. Corp., 49 Misc 2d 525, affd 26 AD2d 636.)
In determining public policy, the court may look to subsequently enacted legislation. While such a law may not be applicable in determining the liabilities of parties to a contract entered into prior to its enactment, it can be used to establish whether a party’s waiver of a protection afforded him by law violates public policy, by clarifying the Legislature’s intent with respect to the public policy involved. (Horning v Gore, 87 AD2d 34, 37.) Therefore, subdivision 4 of section 2805-f of the Public Health Law discussed supra is relevant in that respect. Both that statute and its Federal counterpart predecessor (US Code, tit 42, § 1396h) make it a criminal act to charge more than is received from Medicaid. In each case, conviction carries a severe penalty, as a class E felony in New York, and by up to five years in prison and a $25,000 fine or both on the Federal level. This reflects a legislative conclusion that the act is a heinous one, and both the Federal and the State legislation manifest that public policy is involved.
In his memorandum on signing the New York State bill, then Governor Hugh L. Carey indicated his approval was based in part upon a year-long investigation of admissions practices of nonprofit nursing homes, revealing, as he stated, that “some unscrupulous facilities regularly solicited contributions from patients and families as part of their preadmission procedures.” (Governor’s Memoran *791 dum, McKinney’s Session Laws of NY, 1982, p 2623.) This supports the conclusion that there are important public policy considerations involved.
Federal legislative history reinforces this. Although at one time the Federal rules permitted “supplementation” programs, which allowed payments to nursing homes by a Medicaid recipient’s friends or relatives who were not legally obligated to contribute to that recipient’s support, Congress recognized this practice was not a desirable one: “There are wide variations among the States in the manner of financing the cost of nursing home care provided to the needy. In some States, the full cost of care is paid. In others, a negotiated rate is developed which may or may not approximate the reasonable cost or reasonable charges for the services provided. Some States, however, depend upon the supplementation of the State agency’s below-cost allowances for care with contributions from relatives or the needy individual himself. As a matter of public policy, it would be best for all concerned: the needy individual, his relatives, the State agency and the nursing home if the reimbursement made by the State represented the reasonable cost or reasonable charges for comparable services.” (Senate Report No. 744, US Code Cong & Admin News, 1967, vol 2, p 3026; emphasis supplied.) This Senate report clarifies that public policy is at issue here, and, thereafter, when the Secretary of Health Education and Welfare promulgated a resolution eliminating such “supplementation”, he was found to have been acting within Congressional intent and properly. (Johnson’s Professional Nursing Home v Weinberger, 490 F2d 841.)
The regulations at issue, on their face, are comprehensive of every kind of arrangement, their purpose was directed toward promoting the public good, and the rules were designed as a protection against the misfortune of the poor. When such are the circumstances, restricting the general operation of the rule does not even lie within the province of the court. (See Crowe v Liquid Carbonic Co., 208 NY 396.) There is also the concern that if the clause in the contract be deemed an effective waiver, such “waivers” will rapidly find their way into all nursing home contracts, thereby rendering the public’s protection of Medicaid re *792 cipients and their families totally ineffective. (See Wood Co. v Morgan, 291 NY 422, 426.)
Perhaps the court’s concern is best exemplified by the manner in which plaintiff’s own representatives described the effect of the contract. In her affidavit submitted in support of plaintiff’s motion, plaintiff’s admissions coordinator stated that she discussed with defendant “the 18 month period during which the agreement prohibited the application for medical assistance.” Then, at page 13 of its memorandum of law submitted in support of its motion, plaintiff states that defendant’s application for Medicaid made on behalf of his mother was “[i]n violation of the admissions agreement”. Plaintiff’s apparent intent of denying a poor person the right to make application for assistance which the State and Federal governments have seen fit to provide cannot be condoned legally or morally.
Accordingly, defendants are granted judgment dismissing the complaint.

 Specifically, the Minnesota Department of Public Welfare Rule 47 (F) (1) provides as follows: “1. Payments to eligible providers. Participation in the MA program is limited to those providers of medical care, service and supplies who accept as payment in *789 full amounts paid in accordance with DPW’s maximum allowable charges. Providers are prohibited from requesting or receiving additional payment from the recipient, his relatives or guardian, except to meet the spend-down provision of state law. Providers will be directly paid for providing medical care and services rendered within the scope of practice recognized under federal and state law and regulations.”