**Daniel B. DeGREGORIO et al.**

v.

**Helen B. O'BANNON et al.**

**Civ. A. No. 75-2033.**

United States District Court,
E. D. Pennsylvania.

Oct. 16, 1980.

Stephen F. Gold, Community Legal Services, Philadelphia, Pa., for plaintiffs. R. Michael Kemler, on the brief.

Robert B. Hoffman, Deputy Atty. Gen., Pennsylvania Dept. of Justice, Harrisburg, Pa., for defendants.

## OPINION

LOUIS H. POLLAK, District Judge.

Presently for decision are cross–motions for summary judgment by plaintiffs, a class consisting of, *inter alia*, recipients of medical assistance who are eligible for care in skilled nursing facilities, but who have been unable to obtain beds in skilled nursing facilities which participate in the Pennsylvania Medical Assistance Program, and by defendants, officials of the Commonwealth responsible for the administration of that program. Although plaintiffs assert a number of statutory, regulatory and constitutional claims, all of which factually derive from the difficulty which they, as medical assistance (Medicaid) recipients have in procuring skilled nursing care in the Commonwealth, plaintiffs seek summary judgment on only one: that Pennsylvania's plan for medical assistance violates applicable federal regulatory guidelines in failing to set a level of payments to nursing homes which will ensure that skilled nursing care will be available to medical assistance recipients "at least to the extent that those services are available to the general population." See 42 C.F.R. 447.204. Defendants argue against plaintiffs' motion, and in support of their own summary judgment motion, that the Department of Health, Education and Welfare's (now Health and Human Services) approval of Pennsylvania's state plan, and the plan's provisions for setting rates on "a reasonable cost–related basis," as required by 42 U.S.C. § 1396a(a)(13)(E) and derivative regulations, "automatically [fulfill] the state's obligations regarding the provision of SNF (Skilled Nursing Facility) services." Brief in Support of Commonwealth Defendants' Motion for Summary Judgment, p. 6. An amicus brief filed by the Department of Health and Human Services endorses generally the defendants' position.[1]

### I.

The facts underlying this legal controversy are not contested.[2] Daniel B. DeGrego-

---

[1.] H.H.S.'s amicus participation was invited by my Memorandum and Order of February 20, 1980, and by a letter sent, shortly thereafter, to the Principal Regional Official of the Department of Health, Education and Welfare. H.H.S. filed its amicus brief on September 16, 1980. The parties quickly responded to H.H.S.'s views.

[2.] Along with the Motion and Memorandum of Law submitted on April 6, 1979, plaintiffs submitted a document entitled "Plaintiffs' Statement of Undisputed Material Facts in Support of Their Motion for a Summary Judgment." Although defendants have periodically sought to update certain portions of plaintiffs' statement of facts, they have not attempted to dis-

rio, the named plaintiff, was an eligible recipient of medicaid who, despite state certification that he required care in a skilled nursing facility, was unable to procure a bed in a skilled nursing facility participating in the state's medicaid program. Plaintiff DeGregorio was not alone in this difficulty. There is a severe shortage of nursing home beds in the Commonwealth. And, significantly for purposes of this litigation, medicaid recipients suffer disproportionately the impact of this shortage. While non-medicaid patients (privately paying patients and patients whose fees are paid under the medicare program) frequently gain immediate admission to skilled nursing facilities, many medical assistance patients wait a very long time before finding a suitable placement,[3] and others are unable to gain admission at all. Medical assistance recipients attempting to gain admission to skilled nursing facilities are routinely rejected by nursing homes in favor of providing or reserving space for private patients. And homes which provide special services and the highest quality of care tend to reject medicaid patients more frequently than nursing homes that provide a lower quality of care.

The preference which nursing homes demonstrate for private and medicare patients, and the consequent relative difficulty which medicaid patients have in obtaining care at skilled nursing facilities, is due, in very substantial measure, to the relatively low level of reimbursement which the homes receive for treating medicaid patients. At the time of the filing of plaintiffs' summary judgment motion, the reimbursement rate for medicaid patients was set at twenty-seven dollars a day (with an additional allowance of, on the average, $3.50 per day, where appropriate, for depreciation and interest). For medicare patients, reimbursement averaged thirty-four dollars a day. Private patients paid a daily tariff of up to forty-five dollars.[4] The economic incentive for preferring private (and medicare) patients over medicaid patients, even to the extent of leaving beds open for some time, despite requests for admission by medicaid recipients, with the expectation that private (or medicare) patients will be found to occupy those beds, is thus clear. And the economic equation which plaintiffs assert to be dispositive of this litigation is easily stated: Unless the state reimburses Pennsylvania's nursing homes at rates commensurate with those which private patients are willing to pay, medicaid patients will not achieve access to skilled nursing facilities comparable to the access afforded the general population.[5]

pute its essential accuracy. Plaintiffs' recitation is supported by suitable affidavits, and the factual recitation contained in this Memorandum relies heavily on plaintiffs' document.

3. Although the record is clear that medicare patients have greater success in gaining admission than do medicaid patients, the precise extent of the medicare patient's advantage is not entirely clear. As between medicaid patients and privately paying patients, however, the disparity is startling. At one hospital, it took an average of 633 days to place a medicaid patient in a skilled nursing facility; it took an average of 3.35 days to place a privately paying patient.

4. By a series of letters, defendants have apprised the court of increases in medical assistance reimbursement. According to the most recent submission, the rate in the Philadelphia area is currently set at $36.45 per day, with an additional allowance for depreciation and interest. This information may of course bear directly on the need for, and the extent to which injunctive relief will be required in this case. It should be noted, however, that defendants' submissions are not entirely responsive to plaintiffs' argument; they detail increases in medicaid reimbursement; they do not detail the current market rate for private patients, or indeed, the current average medicare reimbursement.

5. It might be noted that the fact of relatively lower rates for medicaid patients would not, in every medical services marketplace, produce a commensurate difficulty for medicaid patients in obtaining care. If, for example, the number of available nursing home beds met or exceeded the total demand for those beds, nursing home owners could be expected to accept medicaid patients at any rate which would be above the marginal cost of caring for those patients. That hypothetical circumstance is, of course, not the present situation in the Commonwealth. The record is clear on the subject of what is perhaps the most basic economic fact affecting the delivery of skilled nursing services to needy individuals: a severe shortage of available nursing home beds.

Against this factual background, plaintiffs juxtapose a regulation of the Department of Health and Human Services, currently codified at 42 C.F.R. § 447.204, and entitled therein, "Encouragement of Provider Participation." Judging from its current placement in the Code of Federal Regulations,[6] and by its unqualified text, the regulation establishes a principle to be applied generally to rate–setting for medicaid services. It states that:

> The agency's payments must be sufficient to enlist enough providers so that services under the plan are available to recipients at least to the extent that these services are available to the general population.

Notwithstanding the apparent mandate of this regulation, and the uncontroverted relative disadvantage which medicaid patients have in obtaining skilled nursing care, defendants argue that the Commonwealth's reimbursement rates for skilled nursing facilities are fully consistent with the medicaid legislation, and the regulations promulgated thereunder, as those provisions focus on the reimbursement of skilled nursing facilities. Before considering in detail the Commonwealth's argument, it would be useful to set forth some additional statutory and regulatory background.

## II.

The medicaid legislation, Title XIX of the Social Security Act, 42 U.S.C. §§ 1396–1396g, established a cooperative Federal–State medical assistance program, operated and partially financed by the states, but subject to pervasive federal regulation. *See Beal v. Doe*, 432 U.S. 438, 97 S.Ct. 2366, 53 L.Ed.2d 464 (1977); *Aitchison v. Berger*, 404 F.Supp. 1137 (S.D.N.Y.1975). Each year the federal government allocates funds to participating states "[f]or the purpose of enabling each state, as far as practicable under the conditions in such state, to furnish," medical assistance to certain categories of needy individuals. 42 U.S.C. § 1396.

The state is then charged with the principal responsibility for administering the program; including the responsibility of determining the eligibility of recipients, enlisting medical service providers, and paying those providers for services rendered. The recipient is allowed to seek necessary services from any of the enlisted providers. 42 U.S.C. § 1396a(a)(23).

State participation in the program is, of course, voluntary. But federal funds appropriated under Title XIX of the Social Security Act may only be dispersed to "states which have submitted, and had approved by the Secretary of Health and Human Services, state plans for medical assistance." 42 U.S.C. § 1396. Section 1396a sets forth the contents required of the state plan. Subsection 1396a(a)(13)(B) requires participating states to provide services within at least five general categories of medical treatment, including care offered at skilled nursing facilities. Subsection (a)(30) of 42 U.S.C. § 1396a requires participating states to establish procedures for monitoring utilization and costs:

> [(a) A state plan for medical assistance must–] . . . .
> (30) provide such methods and procedures relating to the utilization of, and the payment for, care and services available under the plan . . . as may be necessary to safeguard against unnecessary utilization of such care and services and *to assure that payments . . . are not in excess of reasonable charges consistent with efficiency, economy, and quality of care.* (emphasis added)

42 U.S.C. § 1396a(a)(30).

In 1972, Congress amended Title XIX of the Social Security Act to require that the state plan provide,

> effective July 1, 1976, *for payment of the skilled nursing facility* and intermediate care facility *services provided under the plan on a reasonable cost related basis,* as determined in accordance with methods and standards which shall be developed

---

**6.** The regulation appears in "Subpart B-Payment Methods: General Provisions" of Part 447, "Payments for Services of Subchapter C–

'Medical Assistance Programs' " under Chapter IV "Health Care Financing Administration, Department of Health, Education and Welfare."

by the state on the basis of cost–finding methods approved and verified by the Secretary.

(emphasis added)

Social Security Amendments of 1972, § 249(a), 42 U.S.C. § 1396a(a)(13)(E). Congress intended that the states be afforded considerable latitude in the areas of cost–finding and rate–setting under this section. *See Alabama Nursing Home Ass'n v. Harris*, 617 F.2d 388, 392 (5th Cir. 1980). But while a state has the flexibility "to select its reasonable cost related reimbursement rate from a spectrum of acceptable figures," *id.*, H.H.S. has, by regulation, attempted to clarify allowable costs, and permissible rate–setting methodologies. See 42 C.F.R. §§ 447.278–447.284. In addition, acting to effectuate Congress' concern over the effect of underpayment and overpayment on, respectively, the quality of care, and the efficiency of operations,[7] the Secretary has established an upper and a lower limit on reimbursement rates for skilled nursing facilities.[8] At the lower end:

Payment rates must not be set lower than rates that the agency reasonably finds to be adequate to reimburse in full the actual allowable costs of a facility that is economically and efficiently operated.

42 C.F.R. § 447.302(b). At the upper limit:[9]

The agency may not pay more for long–term care facility services than the provider's customary charge.

42 C.F.R. § 447.315(a).

### III.

It is the defendants' position that 42 U.S.C. § 1396a(a)(13)(E), and the regulations derived therefrom, comprise the totality of federally imposed limitations on state nursing home reimbursement rates under Title XIX. Because the Commonwealth's rates fall within the spectrum of allowances computed on a reasonable cost–related basis (as that phrase is elaborated upon in the implementing regulations), the defendants argue that the Commonwealth has fulfilled all federally imposed obligations on state rate–setting for long–term nursing care.

Indeed, plaintiffs concede that the rates established by the Commonwealth are reasonably cost–related within the meaning of the statute. They contend, however, that there is an additional federally imposed obligation in the form of 42 C.F.R. § 447.204– the so–called "equal access" regulation quoted above.

█ Neither the legislative history, nor the language of 42 U.S.C. § 1396a(a)(13)(E), supports defendants' supposition that in establishing that the rates for the reimbursement of long–term care facilities be set on a "reasonable cost–related basis," Congress intended thereby to repeal all prior statutory and regulatory instruction pertinent to nursing home reimbursement. The long–standing instruction, set forth at 42 U.S.C. § 1396a(a)(30), that payments for care and services not be "in excess of reasonable charges consistent with efficiency, economy, and quality of care," continues to be viewed by the Secretary as a significant source of regulatory authority over nursing home reimbursement. See Footnote 8, *supra*. And, unless shown to be inconsistent with statute, or with later, or otherwise more authoritative regulatory provisions, all lawful-

---

7. See Senate Report No. 92–1230, at pp. 287–288; 41 Fed.Reg. at 27,300 quoted at 617 F.2d 392, n. 6.

8. *Section 447.302, which sets forth the lower limit, is designed to implement that provision of Title XIX, (42 U.S.C. § 1396a(a)(13)(E) which requires the state plan to provide for the payment of long term care facility services on a reasonable cost -related basis. The upper limits established by §§ 447.315 through 447.361 implement that section of Title XIX, (42 U.S.C. § 1396a(a)(30)) which requires that payments must not exceed reasonable charges consistent* with efficiency, economy and quality of care. See 42 C.F.R. § 447.250.

9. This limitation applies to proprietary facilities. For public facilities, the maximum reimbursement apparently corresponds to any amount which the state computes on a reasonable cost–related basis. 42 C.F.R. § 447.315(b). In addition, where rates are determined retrospectively, the payment may not be more than is paid under medicare principles of provider reimbursement. 42 C.F.R. § 447.316.

ly enacted regulations of a federal agency will bind both the agency and its regulatees. Thus, the continued vitality of the "equal access" regulation, which the plaintiffs here seek to enforce, will be tested by its consistency with related legislative and regulatory pronouncements, both subsequent and antecedent.

### "Reasonable Cost–Related Reimbursement" and "Equal Access"

The balance of Part III of this Opinion undertakes to explicate the regulatory and legislative context of "reasonable cost–related reimbursement" and "equal access." Before this explication, there is set forth in summary fashion the principal conclusions which I have drawn from these regulatory and legislative materials:

■ 1) A state plan which relied, to any significant extent, on price–competition and prevailing market conditions in setting nursing home reimbursement rates, would conflict with Congress' consistent desire to set rates on a reasonable cost–related basis.

■ 2) Within the framework of reasonable cost–related reimbursement, states may include such adequate return on investment capital as would promote the availability of skilled nursing services to medicaid recipients.

■ 3) The "equal access" regulation relied on by plaintiffs does *not* require that, in order to ensure that undersupplies do not fall disproportionately on medicaid beneficiaries, states set medicaid rates which are price–competitive; but the regulation does require that, in establishing reimbursement rates, states seek to encourage a sufficient supply of medical services to meet in responsible fashion the needs of medicaid recipients.

### A. Reasonable Cost–Related Reimbursement and Provider Profits

Plaintiffs view the equal access regulation as requiring the Commonwealth to set rates which afford nursing home providers a sufficient profit to render them economically indifferent to whether patients competing for available space are medicaid recipients or privately paying patients. Plaintiffs suggest that there is sufficient flexibility within the framework of reasonable cost–related reimbursement for states to set rates at that high level. They note, in this regard, that under the Secretary's regulations, the maximum rate is one that does not exceed the institution's "customary charge." See text at Footnote 9.

Congress' attempt to encourage efficiency and economy in the provision of skilled nursing services, by linking rate–setting to the systematic determination of reasonable costs, contrasts sharply with the market–oriented model of rate–setting embraced by the plaintiffs. In setting tariffs for their private patients, nursing homes are constrained, if at all, only by the forces of the marketplace. There appears to be no legislatively imposed program of cost–control designed to encourage economy and efficiency in the treatment of private individuals. If, during periods of high demand, medicaid reimbursement was required to mirror rates charged private patients, the margin of profit in the treatment of medicaid recipients would necessarily expand.[10]

■ But profits measured by the difference between an institution's costs, and the price at which the institution can sell its services in a market characterized by excess demand, would be thoroughly inconsistent with Congress' desire to keep medicaid expenditures within reasonable bounds. See *American Health Care Ass'n, Inc. v. Califano*, 443 F.Supp. 612 (D.C.D.C.1977) ("we are satisfied that it was the overriding intent of Congress to place restrictions on the recovery of profits . . ."). Under the Secretary's regulations, the expectable desire of nursing home operators to maximize their profits is channelled through a rate–setting structure designed to keep costs down rather than drive rates up. Medicaid reimbursement rates need not meet the costs an institution actually incurs in treating med-

---

**10.** It is not overly speculative to note that if medicaid patients were sufficiently subsidized to compete economically with privately paying patients, the "market rate" for skilled nursing services would likely be driven upwards still further in response to the increased demand.

icaid patients. The states are authorized to reimburse only reasonable costs. Economic incentives are preserved in one form: Setting payment rates, measured by the operational costs of an efficient institution, on a class basis, means that efficiently operated facilities, which provide services at less than the class rate, will be able to earn a profit equal to the difference between the applicable rate and its actual cost to the efficient provider.[11] See *id.*; 41 Fed.Reg. 27303–04.

The legislative history of 42 U.S.C. § 1396a(a)(13)(E) makes clear, however, that Congress was concerned with the problem of medicaid underpayment, as well as with the problem of provider inefficiency. Sen.Rep.No. 92–1230, at pp. 287–288. In setting forth the regulatory structure implementing 42 U.S.C. § 1396a(a)(13)(E), the Secretary acknowledged that if rates are set too low, "facilities may refuse to accept medicaid patients." 41 Fed.Reg. at 27303. Consistently with principles of cost–related reimbursement, the states may, therefore, incorporate into their reimbursement formula certain "incentives to upgrade the quality of care and to provide for growth and improvements." *Id.* The Secretary has explained the nature and the source of the state's flexibility, in the following terms:

> The legislative history also makes clear that states may take into account in set-

*ting their payment rates the need to assure that adequate numbers of qualified facilities are available and willing to participate in the Medicaid program,* and to provide incentives to participating facilities to upgrade the quality of care. For example, the Senate Report indicates that Congress intended states to have the option to adopt the Medicare formula, which provides for a profit for proprietary providers in the form of an allowance for a reasonable return on owner's net capital equity; the fact that this option is available indicates that states are to be free to include a similar profit for proprietary providers in calculating the reasonable cost–related rate. States may include as an allowable cost whatever return is necessary to avoid withdrawal of capital and to attract additional capital needed for expansion.[12] (emphasis added)

41 Fed.Reg. at 27303. Thus, it is clear that there is no fundamental inconsistency between principles of cost–related reimbursement, on the one hand, and, on the other, the goal of providing adequate nursing home access for medicaid recipients.

### B. *The "Equal Access Regulation"*

This memorandum–opinion has devoted some time to identifying the sources of

11. The requirement of rate parity which plaintiffs contend is mandated in this case by the "equal access" regulation, would bring that regulation into conflict with the regulatory plan for skilled nursing care reimbursement in a second significant respect. As noted above, at the time the motion for summary judgment was filed, reimbursement rates for medicaid were well below average medicare reimbursement rates, and even farther below the amount which the homes routinely charged private patients. The medicare regulations do not appear to contain a provision comparable to medicaid's "equal access" regulation. If it were determined that medicaid's equal access regulation required a state to supplement its cost formula in order to create payment parity between medicaid and private patients, it would then fall upon recipients of medicare to bear the brunt of the shortage of nursing home beds. Higher rates for medicaid patients than for medicare patients, could hardly be within the contemplation of the regulations. Cf. 42 C.F.R. § 447.316(a) ("If the agency pays a medicaid provider under a retrospective payment system, it may not pay more than would be paid under medicare principles of provider reimbursement...") Although states are authorized to adapt cost–related reimbursement methods, established under the medicaid system, to medicare reimbursement, the Senate Report was at pains to note that the Secretary would then have the flexibility "to adjust a rate upward where appropriate, to reimburse for specific factors related to medicare requirements (*such as keeping a reasonable number of beds available*, type of occupancy covered, any additional administrative costs) *which are not considered by the state or included in the computation of its medicaid rates.*" S.Rep.No. 92–130, 92d Cong., 2d Sess. 287 at 288 (1972) (emphasis added).

12. The Secretary goes on to point out that such an inducement to investment capital would only be appropriate in the case of proprietary homes.

consistency, and of tension, between the current regulatory philosophy of rate–setting for skilled nursing facilities, and the view plaintiffs espouse under the rubric of the "equal access" regulation. It may now be fruitful to take a second, and closer, look at the "equal access" regulation itself. Currently codified at 42 C.F.R. § 447.204, the regulation requires that:

> *Encouragement of Provider Participation*
> The agency's payments must be sufficient to enlist enough providers so that services under the plan are available to recipients at least to the extent that those services are available to the general population.

Although it has been part of the regulatory fabric of medicaid rate–setting since 1966,[13] the origins of the regulation are somewhat obscure. It is notable that none of the parties, nor the Secretary in her amicus brief, has attempted to trace the source of this regulation to portions of the statutory text, or to passages from the legislative history, which might suggest that equality of access, between medicaid recipients and other groups of persons seeking medical services, was a specific legislative goal.[14]

In her amicus brief, the Secretary explains that the regulation was designed to complement the payment ceiling of 42 U.S.C. § 1396a(a)(13)(E), by imposing a minimum level of medicaid reimbursement for each service provided under the state plan–a "payment floor" which the Secretary suggests has, with respect to skilled nursing facility reimbursement, been rendered nugatory by the subsequent promulgation of 42 C.F.R. § 447.302(b). That regulation provides that rates be set no lower than the rate which will reimburse in full the allowable costs of an economically operated facility. See text at Footnote 8, *supra*. Skilled nursing homes are thus assured that, with due attention to efficient operation, they will be reimbursed fairly for their services in treating medicaid patients.

Minimum levels of reimbursement, however, serve an additional, and vital, function under the Medicaid Act. A state which elects to participate in the medicaid program is required to provide eligible recipients with assistance in five general categories of medical treatment. 42 U.S.C. §§ 1396a(a)(13)(B); 1396d(a)(1–5). Unless rates are set for each of the required services at a level which will offer a sufficient number of providers the opportunity to receive payments which will exceed their marginal cost for servicing medicaid recipients (and to be induced thereby to enlist in the program), it would be possible for states to evade the federal requirement of providing all five categories of services, by setting unreasonably low rates for certain disfavored services. The assurance provided by 42 C.F.R. § 447.302(b) may, in some instances, in itself be sufficient to elicit substantial provider participation. But the "equal access" regulation tests directly the adequacy of a rate in furthering the goals of the Medicaid Act, by evaluating the rate's per-

---

**13.** As H.H.S. traces in its brief: The regulation originally appeared in 1966 in H.E.W.'s *Handbook of Public Assistance Administration, Supplement D*, § D 5320.1, as the first of several requirements of a state medicaid plan. It was first promulgated–with no significant commentary as a regulation in 1971 at 45 C.F.R. § 250.30(a)(5), 36 Fed.Reg. 21591, and at that time stated that a state plan must:

> Provide that fee structures will be established which are designed to enlist participation of a sufficient number of providers of services in the program so that eligible persons can receive the medical care and services included in the plan at least to the extent these are available to the general population.

In 1975, the regulation was recodified at 45 C.F.R. § 250.30(a)(6); in 1976 at 45 C.F.R.

§ 250.30(a)(7). When the Medicaid regulations were moved to 42 C.F.R. the regulation appeared at § 450.30(a)(7). In 1978, the language of the statute was simplified, without any intended change in meaning, 43 Fed.Reg. 45176, and the regulation was given its present placement. See footnote 6, supra.

**14.** This is not to suggest that either federal regulatory instruction, or state legislation, which attempted more equitably to distribute the burden of the shortage of skilled nursing services, by requiring nursing homes (1) to accept patients without regard to source of payment, or (2) to reserve some proportion of beds for indigents, would be inconsistent with the Congressional mandate.

formance in making medical services available to eligible individuals.[15]

Plaintiffs have, throughout this litigation, suggested that the state's compliance with the "equal access" regulation should be measured by whether medicaid patients "gain admission to skilled nursing facilities 'to the extent that those services are available to the general population.'" Plaintiffs' Memorandum in Support of Their Motions for Partial Summary Judgment and Contra Defendants' Motion for Summary Judgment, p. 2. Upon this view they premise their further argument that the regulation is an engine by which to redress the competitive disadvantage of medicaid recipients in a highly competitive medical services marketplace. But that is not what the regulation, either by its literal terms, or in light of its history and background, comprehends. The text focuses instead on requiring that the state's reimbursement formula be designed to engage a sufficient number of providers to make the state's medicaid program meaningful in all respects. And, as a corollary, the regulation requires that states attempt, through their rate structure, to rectify deficiencies in medicaid patient access to medical services, even if those deficiencies are the product of an undersupply of available facilities. In this, the "equal access" regulation is consistent with, and provides a salutary supplement to, the remainder of the regulatory plan.

### IV.

■ Read in light of its purposes, and in conjunction with subsequent legislation and regulation, the "equal access" regulation does not require rate parity for medicaid patients even in periods of excess demand for skilled nursing care. The "equal access" regulation does require that the reimbursement rate be set sufficiently high to allow some marginal profit in servicing medicaid patients to enough skilled nursing facilities so as to ensure that medicaid patients have substantial access to such facilities. If, within a particular state, there is so great a demand for skilled nursing care that sufficient beds are not made available to medicaid patients, even though the established rates afford a very high percentage of providers the opportunity to participate profitably in the medicaid program, the "equal access" regulation further requires that the reimbursement rate also include such reasonable incentives to capital expenditure as will encourage that expansion of existing skilled nursing facilities, and/or that entry into the field of new providers, as will promptly correct the deficiency. The regulation does not, however, overrule the coordinate requirement of "reasonable cost–relatedness." Thus, while a state is constrained to structure its reimbursement system to perform effectively those functions which the "equal access" regulation assigns to state rate–setting, a state must, at the same time, accomplish the difficult task of incorporating into that reimbursement structure those assurances of efficient and economical operation which were the core of Congress' recent concern.

■ Approximately seventy percent [453 out of about 650] of Pennsylvania's skilled nursing facilities participated in the medicaid program at the time the motion for summary judgment was filed by the plaintiffs. Under some circumstances, 70% participation might suffice. See *District of Columbia Podiatry Soc. v. District of Columbia*, 407 F.Supp. 1259 (D.D.C.1975) (While two–thirds would normally be the minimum acceptable level of participation, it could not be concluded that 60% was insufficient). But, in light of the undenied severe shortage of skilled nursing beds in the Commonwealth, and the infrequency with which enrolled homes elected to admit

---

15. Thus, the state must establish rates which conform to the minimum requirements of both 42 C.F.R. § 447.302(b) and 42 C.F.R. § 447.204. Either of the two regulations may, depending on the circumstance, set the higher standard, and, therefore, the operative minimum rate. For example, if the Commonwealth here assured "equal access" through some mechanism other than its reimbursement rate, the Commonwealth's obligations under 42 C.F.R. § 447.-204 would be fulfilled, but 42 C.F.R. § 447.-302(b) would still require the Commonwealth to assure providers a rate which would meet the costs of an efficiently operated institution.

medicaid recipients, it is apparent that 70% participation was, in itself, inadequate to make nursing home care reasonably available to medicaid recipients. If providers nominally participating in the medicaid program do not, in fact, readily offer their services to medicaid recipients, with the result that medicaid recipients are denied access to services comparable to that afforded the general population, the "equal access" regulation requires, at a minimum, that the Commonwealth set rates with a view toward enlarging the base of provider participation. In addition, if an increase in the percentage of participating facilities will not, in itself, guarantee sufficient access to skilled nursing services, then the Commonwealth must formulate reimbursement rates with an eye toward encouraging such capital expansion as will relieve the competitive disadvantage of medicaid recipients by enlarging the total pool of nursing home beds.[16]

 It does not appear, on this record, that the Commonwealth has given explicit and reasonable attention to the goal of equal access in setting reimbursement rates. (Nor have the defendants shown why strides in the direction of equal access cannot be made by adjustment of the reimbursement rate within a framework of reasonable cost-related reimbursement). On the other hand, it also does not appear, on this record, that the rates which the Commonwealth has set will not, in fact, now or in the near future, afford that access to medical care which is medicaid's promise.

Since the present record does not entitle plaintiffs to a decree in their favor, and also does not entitle defendants to an order of dismissal, both of the cross-motions for summary judgment will be denied.

---

16. The Commonwealth may, of course, promote "equal access" through the deployment of regulatory devices other than the reimbursement rate, cf., footnote 14, supra.