**Ginnie TRIPP, et al., Plaintiffs,**

v.

**Gregory COLER, et al., Defendants.**

**No. 80 C 3065.**

United States District Court,
N.D. Illinois, E.D.

July 16, 1986.

Nelson A. Soltman, Legal Assistance Foundation of Chicago, Chicago, Ill., for plaintiffs.

Neil Hartigan, Atty. Gen., and Steven Hogroian and Barbara L. Greenspan, Sp. Asst. Attys. Gen., Chicago, Ill., for defendants.

## MEMORANDUM AND ORDER

MORAN, District Judge.

Plaintiffs are a class of people whose continued use of Medicaid has been restricted or terminated by the Illinois Department of Public Aid (the Department) through its Recipient Utilization Review Program (the Program) (whatever became of the word "use"?). The Program has set a standard for determining which Medicaid recipients have overused medical services and has implemented a system for forcing compliance with its standard. The plaintiffs claim both the standard and the system violate their federal statutory rights to choose their medical provider and to receive emergency medical care, as well as their federal constitutional and statutory right to adequate notice and hearing prior to restriction or termination of Medicaid coverage. The class (which has been certified) moves for summary judgment on all claims.[1] We grant in substantial part and deny in part.

---

1. The plaintiff classes are defined as follows: Count I, all recipients of benefits under the Medicaid program who have been or are being or will be required by the Illinois Department of Public Aid (IDPA) under its Recipient Utilization Review Program to justify or reduce their usage of medical services or designate one physician for the provision or authorization of all non-emergency medical care or lose their medical eligibility altogether (amen. complaint, count I, ¶ 9).

Count II, all recipients of benefits under the Medicaid program whose usage of medical services has been, is or will be below IDPA's numerical standard of what constitutes overutilization, but who have been, are being or will be

## I. THE STATUTORY SCHEME

The Medicaid Program, Title XIX of the Social Security Act, 42 U.S.C. § 1396 *et seq.*, is designed to provide health care for eligible poor persons roughly equal in quantity and quality to care available to the general population. Consistent with this goal the Act provides:

> A State plan for medical assistance must ... provide that any individual eligible for medical assistance (including drugs) may obtain such assistance from any institution, agency, community pharmacy, or person, qualified to perform the service or services required (including an organization which provides such services, or arranges for their availability, on a prepayment basis), who undertakes to provide him such services.

42 U.S.C. § 1396a(a)(23). This requirement plaintiffs call the "freedom of choice" principle.

Until 1981 the freedom of choice principle was absolute. As long as a provider chosen by a recipient was qualified to give services under the Medicaid program the state could not dictate to the recipient that a different provider be used. *See O'Bannon v. Town Court Nursing Center*, 447 U.S. 773, 785 n. 18, 100 S.Ct. 2467, 2475 n. 18, 65 L.Ed.2d 506 (1980). However, as part of the Omnibus Budget Reconciliation Act of 1981, Pub.L. 97–35, Congress enacted an exception to the freedom of choice principle. The exception states that a state does not violate the freedom of choice principle solely because it

> restricts—
>
> (A) for a reasonable period of time the provider or providers from which an individual (eligible for medical assistance for items or services under the State plan) can receive such items or services, if the State has found, after notice and opportunity for a hearing (in accordance with procedures established by the State), that the indi-

vidual has utilized such items or services at a frequency or amount not medically necessary (as determined in accordance with utilization guidelines established by the State), or

> \* \* \* \* \* \*

> if, under such restriction, individuals eligible for medical assistance for such services have reasonable access ... to such services of adequate quality.

42 U.S.C. § 1396n(a)(2)(A). As the House Committee which reported the bill explained:

> The bill also provides for waivers of freedom of choice to allow a State to "lock-in" chronic overutilizers of service to a single physician or limited group of providers. The Committee recognizes that a small number of persons chronically abuse their Medicaid eligibility and overutilize services available to them; this increases program costs and undeservedly influences the way many Medicaid recipients are viewed. In fact, utilization of services by the Medicaid population is below the national average. But where abuses occur, a lock-in procedure may be appropriate. An individual subject to the lock-in arrangement, however, should be given an opportunity to change the provider to be looked into periodically (in no case less frequently than every three months). The Committee is concerned that such waivers apply only to those recipients that clearly and without doubt overutilize services and that, in no event, should services from any certified provider be denied such recipient in the case of genuine emergency. Further, the Committee intends that the Secretary not agree to any waiver that results in substantially impairing access to necessary medical care for any recipient found to be overutilizing specified services.

H.R.Rep. No. 158, 97th Cong., 1st Sess., Vol. II, 309 (1981).

---

restricted by IDPA to one physician for the provision or authorization of all non-emergency medical benefits because the usage of medical services by one or more members of the recipi-

ent's assistance unit exceeds IDPA's numerical standard of what constitutes overuse (amen. complaint, count II, ¶ 7).

The Department of Health and Human Services (HHS), responsible for implementing the Act, promulgated the following regulation corresponding to § 1396n(a)(2)(A):

*Lock-in of Recipients who Overutilize Medicaid Services.* If a Medicaid agency finds that a recipient has utilized Medicaid services or items at a frequency or amount that is not medically necessary, as determined in accordance with utilization guidelines established by the State, the agency may restrict that recipient for a reasonable period of time to obtain Medicaid services or items from designated providers only. The agency may impose these restrictions provided that:

(1) The agency gives the recipient notice and opportunity for a hearing (in accordance with procedures established by the agency) before such restrictions are imposed.

(2) The agency assures that the recipient has reasonable access (taking into account geographic location and reasonable travel time) to Medicaid services of adequate quality.

(3) The restrictions will not apply to emergency services furnished to the recipient.

42 C.F.R. § 431.54(e) (1985).

Medicaid, which is funded jointly by the federal government and each participating state government, is an "experiment in cooperative federalism." *Michael Reese Physicians & Surgeons, S.C. v. Quern,* 606 F.2d 732, 735 (7th Cir.1979), *aff'd on reh'g en banc,* 625 F.2d 764 (7th Cir.1980), *cert. denied,* 449 U.S. 1079, 101 S.Ct. 860, 66 L.Ed.2d 802 (1981). In this case the statute and its regulations give the state wide latitude in developing the appropriate standards. This flexibility is evident in HHS's response to comments on the above regulation before it was finalized in 1983:

The statute gives each State the authority to set its own utilization guidelines.

\* \* \* \* \* \*

... with regard to a reasonable length of time for a lock-in, we believe the time frame should be determined by the State.

[1983 Transfer Binder] Medicare & Medicaid Guide (CCH) ¶ 32,884 at 9443. However, HHS was careful to point out that "any lock-in arrangements must ensure beneficiary access to all necessary medical care." *Id.*

## II. THE PROGRAM

The Department issues cards to those eligible for Medicaid which, when presented to qualified Medicaid providers, entitle recipients to medical care. The cards are issued to each medical "assistance unit" which may contain one or more individuals. For example, each family receiving money from Aid to Families with Dependent Children (AFDC) gets one card.

The program maintains computer records which detail all medical services rendered to each Medicaid recipient. On a quarterly basis the program analyzes the entire Medicaid population to determine average and standard deviations of medical use per recipient per quarter and identifies recipients with usage in excess of the quarterly established maximum usage limit. According to the Illinois Administrative Code which covers the Program,

the maximum usage limit shall be set at a level above which the number of recipients exceeding the norms is equal to the maximum number of cases which the Department is able to investigate.

89 Ill.Admin.Code ch. I, § 120.80(b)(1) (*as amended* Dec. 12, 1984). Plaintiffs maintain that overuse is based on "absolute numbers, without regard to the medical needs and conditions of the recipient families, without public standards stating how many uses of each type of service constitute overuse, without considering the reasons that multiple providers were consulted, and without verifying that services billed for by providers and/or reported on computer printouts actually were delivered." (Second Amen. Complaint ¶ 14–A.)

While defendants originally admitted this (Complaint Ans. ¶ 14–A, filed April 4, 1985), they now deny the same statements in their Exceptions to Plaintiffs' Statement of Ma-

terial Facts (filed Feb. 6, 1986).[2] Their denial is based on the following statement in the Department's AFDC Manual ch. 1120 (dated July 1, 1983):

The determination of overutilization of medical services is made on a case-by-case basis after a thorough evaluation of the recipient's patterns of medical usage has been completed by trained personnel. When necessary, staff physicians are consulted in determining whether a recipient is over-using medical services.

The manual would lead one to believe that a recipient's usage is compared to his or her medical needs by "trained personnel" or "staff physicians." The court realizes, however, that it is one thing to cite a section in a manual requiring certain procedures, and quite another to carry it out. Our skepticism as to the actual implementation of the Manual derives from the following interrogatory and answer:

*Interrogatory 4:* Identify all "staff physicians" referred to in DPA 1935A [a Department form sent to targeted overusers]. State the number of case summaries completed since this form has been in use and the number of those which have been referred to a "staff physician." Describe the various disposition of cases so referred, and the percentages of such disposition.

*Answer to 4:* The staff physicians are Drs. Bayaua and Golan. The Department has completed between 8,000 and 9,000 case summaries since this form has been in use. These summaries are rarely referred to a staff physician. We are not able to find any cases which had been referred.

Besides the fact that case-by-case review by a physician does not seem to be an integral part of the Program, the Department has admitted that it keeps no records indicating a recipient's medical condition. Further, the Illinois Administrative Code explicitly states that "[a]ssistance units may be recommended for restriction when one or more recipients within the unit have

medical usage higher than the *established statistical usage norms* for that category of assistance." 89 Ill.Admin.Code ch. I, ¶ 120.80(b)((1) (*as amended* December 12, 1984). Putting all of this information together, the court concludes that the Department identifies overusers based on statistical comparisons of the frequency of recipient's medical usage without regard to other significant factors such as medical need.

Once an overuser has been identified the Program sends the cardholder a notice that the unit (be it an individual recipient or an AFDC "assistance unit") is required to select a single primary care physician who must authorize or provide all the unit's non-emergency care. This requirement is commonly called the lock-in provision. The details of the notice are discussed in depth *infra*, but its two basic characteristics are that it identifies overuse by "service area," *i.e.*, prescriptions, emergency room, physician services, but does not identify the provider (doctor or hospital) whose services the unit allegedly overused. Second, the notice gives the unit 60 days to appeal the decision. However, if the targeted overuser does not designate a primary care physician within 25 days of the first notice, the Department withholds the medical card for the entire unit. This in effect terminates medical assistance to all members of the unit. After the medical care is withheld recipients can obtain emergency care only by receiving prior authorization from one of the Department's local offices, open Monday through Friday, 8:30 to 4:30.

There is no system internal to the Program for reevaluating recipients' restrictions. Once a Medicaid restriction or termination has occurred it will continue until the recipient or primary care physician requests an end to it. The Department's local office then prepares an evaluation and sends the recipient a written decision.

The restricted recipients are never informed of the policies and procedures available for terminating restrictions. It is not

2. The Department does not deny that the Program does not verify that recipients receive the services which appear on the computer printouts.

surprising, therefore, that only 5.6% of the restricted recipients have requested reevaluations. Half of them have received a release from restrictions.

## III. PLAINTIFFS' SUBSTANTIVE CLAIMS

All of our analysis below is informed by the rule that "[a]lthough participation in the Medicaid Program is entirely optional, once a State elects to participate, it must comply with the requirements of Title XIX." *Harris v. McRae,* 448 U.S. 297, 301, 100 S.Ct. 2671, 2680, 65 L.Ed.2d 784 (1980). The issue is not whether or not the state procedures are reasonable or rational means for combatting abuse of the system but whether or not they comply with means Congress has mandated for that purpose.

### A. Restriction/Termination Decisions on a "Unit" Rather Than an Individual Basis.

 Plaintiffs claim that the Department's practice of restricting all the members in an "assistance unit" when only one has been determined an overuser violates 42 U.S.C. § 1396n(a)(2)(A) and 42 C.F.R. § 431.54(e). Their argument is based on simple statutory interpretation: the statute speaks in terms of "individual" care, not "family unit" care. Similarly, the regulations talk of "restricting [a] recipient," not an assistance unit.

"It is elementary that the starting point in every case involving the construction of a statute is the language itself." *Michael Reese,* 606 F.2d at 735. As the Supreme Court said in *United States v. Turkette,* 452 U.S. 576, 580, 101 S.Ct. 2524, 2527, 69 L.Ed.2d 246 (1981) (RICO case), "[i]f the statutory language is unambiguous, in the absence of legislative intent to the contrary, that language must ordinarily be regarded as conclusive." The term "individual" is unambiguous, at least with respect to whether it means a person or a family. This is especially so in the context

of determining use of medical services, as they are by definition administered on an individual basis. The legislative history on § 1936n supports the interpretation that the exception to the freedom of choice principle must be applied on an individual, not an assistance unit basis. *See* H.R. No. 518, *supra.*

Plaintiffs' argument is fully supported by HHS's own interpretation of the Act. HHS monitors compliance of state plans. In a report prepared in April 1985, the agency found that the Department's practice of locking in families rather than recipient abusers violates the statute. We accept the agency's finding because a presumption exists in favor of it, in the absence of any compelling indications that it is wrong, *Red Lion Broadcasting Co. v. F.C.C.,* 395 U.S. 367, 381, 89 S.Ct. 1794, 1801, 23 L.Ed.2d 371 (1969), and because it is the only reasonable interpretation given the language and context of the statute. *Charleston Memorial Hospital v. Conrad,* 693 F.2d 324, 332 (4th Cir.1982) (standard for review of HHS decisions).[3]

Defendants make a functional argument that if restrictions were on an individual basis, the "individually restricted recipient would have constant and convenient access to the unrestricted card of the others in his assistance unit, and, thus, would have unlimited access to unrestricted services ... the [program] would cease to function and the purpose of the program would be defeated before it began." (Memo. in Opp. to Motion for Summary Judgment, at 17–18.) Such an argument misses the mark for two reasons. First, the state does not have unfettered discretion in implementing federal law in this area. *White v. Beal,* 555 F.2d 1146, 1151 (3d Cir.1977). Second, the perceived functional problem can be easily avoided by either issuing a card to each recipient or by listing the name or number of each recipient in the unit on the card and then designating "restriction" next to the name or number of the individual overuser

---

**3.** An additional argument could be made that restriction on a unit basis amounts to a condition of Medicaid eligibility (on those in the unit not identified as overusers) not imposed by the Act, and is therefore invalid. *See Ruiz v. Blum,* 549 F.Supp. 871–877 (S.D.N.Y.1982).

if listed on the card along with the other recipients in the assistance unit. The inconvenience to the state of either measure cannot compare to the blatant violation of federal law in which the state is engaged.

For the foregoing reasons, the Department is ordered to restrict access to Medicaid only on an individual basis when that individual is found to overuse medical services.

Plaintiffs make several corollary arguments that are partially or entirely addressed by our disposition of the individual/unit basis issue. First, plaintiffs point out that the Department restricts all overusers in a unit to the same primary care physician, rather than allowing each overuser to designate his or physician. We find that this practice violates 42 U.S.C. § 1396n(a)(2)(A) for the reasons discussed above. Further, this practice has the effect of eliminating individual choice for the other overusers in the unit. The restriction in individual choice sanctioned by the Act, while reducing each recipient's choice, does not eliminate it altogether. As the court in *White v. Beal* stated:

> We conclude that when a state decides to distribute a service as part of its participation in Title XIX, its discretion to decide how the service shall be distributed, while broad, is not unfettered: the service must be distributed in a manner which bears a rational relationship to the underlying federal purpose of providing the service to those in greatest need of it.

555 F.2d at 1151.

■ The second corollary argument is more tenuous. Plaintiffs claim that requiring an overuser to designate one primary care physician unlawfully restricts the recipient's access to all medical services—optometric, podiatric, psychiatric, etc.—even if only one item or service has been overused. Such a system, they argue, destroys the nexus required by 42 U.S.C. § 1396n(a)(2)(A) between the restriction and the unnecessary use.

This "nexus" is nowhere stated, but rather inferred from the statutory requirement that a restricted recipient have "reasonable access" to medical services of adequate quality. However, the state argues that such access continues to exist because the primary care physician can always authorize use of medical services in areas outside his or her expertise. As such, the role of the primary care physician is as much a supervisor of an overuser's medical usage as a provider.

The state was given wide latitude in designing the lock-in arrangement, although "any lock-in arrangement must ensure beneficiary access to all necessary medical care." [1983 Transfer Binder] Medicare & Medicaid Guide (CCH) ¶ 32,884 at 9443. Under the Department's system the primary care physician makes the determination of what is necessary care and then authorizes medical usage. We feel this system is reasonable as long as the primary care physician is qualified both by his/her training and by the strictures of medical ethics to provide the overall treatment supervision the state plan calls upon the primary care physician to make. This would not be so if, for example, an overuser with serious eye problems but also with psychiatric disorders and heart disease designated an optometrist as the primary care physician. If this were the case, "reasonable" access to necessary medical care would be unreasonably restricted. Thus, the state must institute a mechanism for reviewing the choice of primary care physician based on the overuser's medical needs so as to assure that the designated physician can provide the overall treatment supervision contemplated. A system so operated would reconcile in a reasonable manner the state's goal of curbing overusers with the statutory requirement that access to medical care exists by creating a system that replaces direct access to all services with indirect access to those same services. *Cf. De Gregorio v. O'Bannon*, 500 F.Supp. 541 (E.D.Pa.1980) (applying this reasonable standard balancing test to another situation).

**B. The Determination of Overusage**

■ The same approach to statutory construction that guided our analysis above

applies to plaintiffs' argument that the Department's method of identifying overusers violates the statutory scheme. 42 U.S.C. § 1396n(a)(2)(A) and 42 C.F.R. § 431.54(e) give the state flexibility to develop "utilization guidelines" for determining when recipients have used medical services and items at a frequency or amount "not medically necessary." Plaintiffs argue that defendants' scheme of tallying the amount of use without any corresponding information on the recipient's medical condition cannot satisfy the statutory standard.

We agree. Any reasonable reading of the term "not medically necessary" at a minimum requires some evaluation of medical condition. This requirement could in the abstract be satisfied by the Department's current practice of observing use if a particular level of use always or almost always indicated overuse. However, this cannot be assumed in the highly individualistic setting of medical services. Therefore, the Department's practice of targeting overusers solely by a statistical review of level of medical usage without any information on his or her medical condition or needs contravenes the statute. The court orders the state to include medical condition in its determination of overuse.[4]

There is, however, nothing improper about using a statistical analysis as a starting point, as the state presently does. The flaw is proceeding directly from that indication of possible overuse to a requirement that the recipient, within a limited time frame, obtain from his or her physician a formal justification of the level of use. The statistically targeted group by definition contains within it those reasonably requiring the highest level of care as well as those who may be abusing the system. The terminally ill and the chronically sick, often both poor and poorly educated,

should not be thrust into the role of implementing a verification system solely on the basis of a computer report on level of usage. To do so is contrary to Congress' concern that "such waivers (of the freedom of choice principle) apply only to those recipients that clearly and without doubt over-utilize services...." H.R.Rep. No. 158, *supra* at 309. The suspicion of a possibility of overuse created by a level of use analysis may lead to inquiries about medical condition through, for example, an interview of the recipient or a request for information from the physician. Those responses may lead to more searching inquiry and a conclusion of overuse. It is up to the Department, however, to satisfy itself that the level of use is not medically necessary, not for a recipient with a high level of use to establish that it is medically necessary. How to accomplish that we leave to the Department. Further, we will require any plan the Department develops to be approved by the court, as per our instructions, *infra.*

### C. Withholding of Medicaid Eligibility Cards as a Sanction for Overuse.

■ If, after receiving notice, an alleged overuser has not identified a primary care physician within a certain period of time, the Department withholds the recipient's Medicaid card. This action restricts the recipient's access to medically necessary services. The recipient has access only to emergency services (and even that is limited by Program rules, as is discussed below).

Plaintiffs correctly term the policy of withholding cards a sanction, and argue that no such sanction is permitted by statute or regulation. They rely on a two-step analysis of the statute. First, the express

**4.** In discussing a statutory provision conditioning disability benefits on "any medically determinable physical or mental impairment," the Supreme Court said only, "... in short, a medical assessment of the worker's physical or mental condition is required." *Mathews v. Eldridge,* 424 U.S. 319, 343, 96 S.Ct. 893, 906, 47 L.Ed.2d 18 (1976). We feel our holding here is also simply stating the obvious. The court in *El-*

*dridge* went on to note that in implementing the statute the state received evaluations from physicians as well as disability recipients, and that these evaluations were reviewed by a physician and a non-medical person trained in disability evaluation. *Id.* at 337, 96 S.Ct. at 904. This system provided adequate due process protection against erroneous deprivations. *Id.* at 340, 96 S.Ct. at 905.

language of 42 U.S.C. § 1396n(a)(2)(A) permits "restriction" of the freedom of choice principle, consistent with "reasonable access" to medical care, not *termination* of access. Second, the statute in other places does provide for "suspension" of Medicaid participation, *see* 42 U.S.C. § 1396n(a)(2)(B) (suspending providers who abuse Medicaid) and 42 U.S.C. § 1396h(a) (suspending recipients criminally convicted). Thus, the argument continues, Congress understood the difference between restriction and suspension, and by leaving the latter out of § 1396n(a)(2)(A) intended to deny the states the sanction of withholding recipients' Medicaid cards.

We find plaintiffs' arguments persuasive. The Department cannot impose a sanction beyond that which is authorized by statute. *Davis v. Reagen*, 630 F.2d 1299 (8th Cir.1980); *Church v. Block*, 531 F.Supp. 279, 283–84 (N.D.N.Y.1981). *See also Kostelic v. Bernardi*, 538 F.Supp. 620 (N.D.Ill.1982) (state cannot impose a sanction not explicitly authorized in a statute if more reasonable measures consistent with the statutory scheme are available). This argument is analogous to the established principle that the Department cannot impose an eligibility requirement prohibited by the statute. *King v. Smith*, 392 U.S. 309, 88 S.Ct. 2128, 20 L.Ed.2d 1118 (1968); *Ruiz v. Blum*, 549 F.Supp. 871 (S.D.N.Y. 1982). The analogy is particularly appropriate because the sanction operates as a barrier to eligibility. Further, the presumption that Congress would have explicitly stated its intention to permit suspension of cards as a sanction if it had so desired works to substantiate plaintiffs' claim of illegality. *Miller v. Youakim*, 440 U.S. 125, 137, 99 S.Ct. 957, 965, 59 L.Ed.2d 194 (1979); *White v. Beal*, 555 F.2d at 1151 n. 4. Therefore, we hold that withholding of Medicaid cards is not permitted under 42 U.S.C. § 1396n(a)(2)(A) even if a recipient has been properly identified as an overuser. A more appropriate response to an overuser's failure to designate a primary care physician would be for the Department to do so. We have not been advised of any

reason why the Department could not so respond.

The practice of withholding Medicaid cards is illegal for its effect on access to emergency care as well. While 42 U.S.C. § 1396n(a)(2)(A) does not address emergency services, its implementing regulation does:

(3) The [lock-in] restrictions will not apply to emergency services furnished to the recipient.

42 C.F.R. § 431.54(e).

This language does not leave much room for interpretation and clearly renders the Department's practice of withholding Medicaid cards illegal. Medicaid recipients access emergency services through their card. Without the card they are without emergency medical care.

The Department claims that recipients' use of emergency care is not denied, but merely channeled through the Department by its requirement that anyone in need of such care contact the local Department office. Ignoring the fact that medical emergencies do not always occur between 8:30 and 4:30, Monday through Friday, the requirement is inconsistent with the state's express purpose of monitoring the use of emergency medical services. As the plaintiffs point out, if a recipient could take the time to wait at a Public Aid office for approval of emergency services, a strong argument can be made that a medical emergency does not exist.

The Department argues that even if a recipient's Medicaid card is withheld and the emergency or the local office hours prohibit getting prior approval, the recipient in desperate need of assistance will know to go to the hospital and get treated. Relying on this "obvious fact," the Department forgets that a recipient without a card does not necessarily know that the Department will pay the hospital for those services, regardless of the recipient's status, and the recipient is not so advised. Indeed, the recipient is told only that emergency care must first be authorized by a local Department office. In any event, we find that 42 C.F.R. § 431.54(e)(3) renders

both the Department's requirement of prior approval for emergency care and the Department's withholding of Medicaid cards illegal.

### D. Restricting Access for a Reasonable Period of Time

■ 42 U.S.C. § 1396n(a)(2)(A) allows the state to restrict access to medical care "for a reasonable period of time." The current system places overusers on restricted status indefinitely, in the sense that the Department has no obligation to review the status of restricted recipients. Thus the system places the burden completely on the affected recipient or his or her physician to change the recipient's restricted status.

The Department cannot substitute "indefinite" for "reasonable." Although the Department has substantial discretion to determine what constitutes a reasonable period of time, its discretion does not include the prerogative to reevaluate recipient's status "at its leisure" when the statute requires that such status exist for a "reasonable period of time" only. *Smith v. Miller*, 665 F.2d 172, 178 (7th Cir.1981) (analyzing Medicaid Act's requirement that applications be processed with "reasonable promptness").

The Department's interpretation of the time requirement is judged by whether it is "rationally related to the statutory goal." *American Hospital Association v. Schweiker*, 721 F.2d 170, 179 (7th Cir.1983), *cert. denied*, 466 U.S. 958, 104 S.Ct. 2169, 80 L.Ed.2d 553 (1984) (discussing HHS' decision to interpret "reasonable volume of services" as requiring a finite measure). The plaintiffs argue that the statute's goal could be achieved either by automatically lifting the restriction at the end of a fixed period of time or by adopting review procedures which are triggered at a certain point. We find these alternatives to be rationally related to the statutory goal. Because the statute gives the state broad discretion in defining its procedures, we will leave the choice between these alternatives up to the Department, with the caveat that in either case an individual cannot be placed on restricted status for more than one year without at least a review of his or her status.

### IV. PLAINTIFFS' PROCEDURAL CLAIMS

Plaintiffs' claims regarding the legal insufficiency of the notices sent to targeted overusers can be reduced to the single contention that the notices are inadequate because they fail to provide any specific information regarding the recipient's alleged overuse. The plaintiffs ground these claims in both the statute, which requires "notice and an opportunity for a hearing," and the due process clause of the Constitution. "Whether the statutory 'fair hearing' requirement has been met is tested by the same standards as constitutional procedural due process." *Camacho v. Bowling*, 562 F.Supp. 1012, 1020 (N.D.Ill.1983). *See also Featherston v. Stanton*, 626 F.2d 591, 593 (7th Cir.1980).

■ The regulations require that any notice contain "the reasons for the intended action." 42 C.F.R. § 431.210(b). Similarly, constitutional due process requires notice that gives the Department's reasons for its action in enough detail that a recipient can prepare a responsive defense. *Goldberg v. Kelly*, 397 U.S. 254, 90 S.Ct. 1011, 25 L.Ed.2d 287 (1970); *Vargas v. Trainor*, 508 F.2d 485 (7th Cir.1974), *cert. denied*, 420 U.S. 1008, 95 S.Ct. 1454, 43 L.Ed.2d 767 (1975).

### A. Notice of the Reasons for the Department's Actions

It is universally agreed that adequate notice lies at the heart of due process. Unless a person is adequately informed of the reasons for denial of a legal interest, the hearing serves no purpose—and resembles more a scene from Kafka than a constitutional process.

*Gray Panthers v. Schweiker*, 652 F.2d 146, 158 (D.C.Cir.1981). Ultimate reasons will not do, *Dilda v. Quern*, 612 F.2d 1055, 1057 (7th Cir.), *cert. denied*, 447 U.S. 935,

100 S.Ct. 3039, 65 L.Ed.2d 1130 (1980); the reasons must be specific enough to inform the recipient how the agency's decision was reached. *See Gray Panthers, supra,* at 169. Further, the agency has a duty to describe the precise issues which will be reviewed on appeal if the recipient appeals the decision to restrict benefits. *Camacho,* 562 F.Supp. at 1023.

■ Given this articulation of due process, we now review the notices sent by the Department to targeted overusers. The overusers get several notices. The first notice is a package of three forms: DPA 1937, 1938 and 1935. DPA 1937, entitled "Restriction Recommendation Due to High Medical Usage," identifies the "Date of Notice" (DON), and tells the recipient that to ensure continuous coverage he or she must, within 15 days of the DON, contact a local officeworker and select a primary care physician, or submit physician's statements justifying his or her high use. The form also explains that the right to appeal the decision attaches for 60 days and that unrestricted medical eligibility will continue *only* if an appeal is filed in writing within ten days of the DON.

The second form, DPA 1938, informs the recipient, "You and/or members of your family have been identified as having unusual medical usage," and repeats in more words what DPA 1937 says. However, DPA 1938 also states:

> If, after 15 days from the date of the notice of restriction decision (DPA 1937) you have not submitted physicians' statements or selected a primary care physician you will be sent a notice of change, DPA 157z. This notice will allow you ten more days to cooperate. If you do not cooperate during that time frame, your medical eligibility card will be withheld until a primary care physician is selected.

Finally, DPA 1935, entitled "Medical Summary," gives the Department's reasons for its determination. The form has a list of reasons by "service area," which someone at the Department checks.[5] The recipient is told, "Family members have been identified as having potential misutilization in one or more of the [listed] areas."

As DPA 1938 warns, a recipient who has not complied with DPA 1937 gets DPA 157z, "Notice of Change." This tells the targeted overuser that:

> Beginning in _____ your medical eligibility card will be withheld until you designate a primary care physician or submit medical justification for your medical usage. After your medical card is withheld you will be able to receive emergency care only by contacting your local office.

The form also reiterates the recipient's right to appeal within 60 days and states that unrestricted medical eligibility will continue only if the appeal is filed in writing within ten days of the DON. Lastly, the form contains telephone numbers that the recipients may call for legal services.

These forms share serious deficiencies. Most obvious is the fact that the targeted overuser is not identified specifically, even if he or she is part of an assistance unit. Our disposition of the merits of restricting usage on an assistance unit basis should erase this problem, however.

Several problems remain. First, DPA 1935, the only form which gives reasons, contains the type of "ultimate reasons" specifically rejected in *Dilda v. Quern, supra.* Second, the forms do not identify the legal standard by which a recipient's use is judged as being medically necessary. Rather than state and explain the standard, the forms contain different and varying

---

5. The list of reasons identified in DPA 1935 are as follows:
High number of physician services; High number of services from different physicians; High number of prescriptions; High number of potentially abusable drugs; Two or more prescriptions for the same drug on the same day; Two or more prescriptions for the same drug within one week; Duplication of services; Excessive use of emergency room.
The Program worker checks one or more of these listed reasons, but is not required to add any information.

terms, none of which contains the phrase "medically necessary."[6]

Having identified these problems, the question of "what process is due" is answered by applying the three-pronged balancing test of *Mathews v. Eldridge,* 424 U.S. 319, 334–335, 96 S.Ct. 893, 902–03, 47 L.Ed.2d 18 (1976).[7]

> More precisely, our prior decisions indicate that identification of the specific dictates of due process generally requires consideration of three distinct factors: First, the private interest that will be affected by the official action; second, the risk of an erroneous deprivation if such interest through the procedures used, and the probable value, if any, of additional or substitute procedural safeguards; and finally, the government's interest, including the function involved and the fiscal and administrative burdens that the additional or substitute procedural requirement would entail.

*See Gray Panthers, supra* (applying this test to this question).

The poor, elderly, blind and disabled (the Medicaid population) have a substantial interest in continued receipt of medical care, affecting as it does in the extreme (but not unforeseeable) instance whether a person will live or die. *Cf. Goldberg v. Kelly,* 397 U.S. 254, 264–66, 90 S.Ct. 1011, 1018–20, 25 L.Ed.2d 287 (1970) and *Hill v. O'Bannon,* 554 F.Supp. 190, 196 (E.D.Pa.1982) (continued receipt of welfare payments); *Camacho,* 562 F.Supp. at 1024. *See also David v. Heckler,* 591 F.Supp. 1033, 1044 (E.D.N.Y.1984) (entitlement program based on need, as Medicaid is, involves substantial private interests); *accord, Gray Panthers,* 652 F.2d at 156.

The risk of erroneous deprivation is also substantial because the system gives the recipient so little time to appeal and so little information on which to base the appeal. The current system is almost identical to the one the Seventh Circuit found constitutionally deficient in *Vargas v. Trainor,* 508 F.2d 485 (1974) (involving notices sent by the same department regarding a reduction in amount of assistance). As the court there said:

> The notice is addressed to persons who are aged, blind, or disabled, many of whom, defendant could have anticipated, would be unable, or disinclined, because of physical handicaps and, in the case of the aged, mental handicapped as well, to take the necessary affirmative action. Within what was left of the ten days after they received the notice, they were required either to manage to meet with their caseworkers and learn the reasons for the proposed action and then decide whether to appeal, or to appeal without knowing whether an appeal might have merit. If they fail to do either, their benefits were reduced or terminated without their being advised why. Under such a procedure only the aggressive receive their due process right to be advised of the reasons for the proposed action. The meek and submissive remain in the dark and suffer their benefits to be reduced or terminated without knowing why the department is taking that action.

*Id.* at 489. *Accord, David v. Heckler,* 591 F.Supp. at 1044; *Gray Panthers,* 652 F.2d at 169.

The final factor, the government's interest in maintaining the status quo, seems almost trivial in comparison because the steps necessary to remedy the problems require minimal effort and cost. For this reason this "factor also represents what is, in this court's opinion, the most inexcusable aspect of the existing appeals structure."

---

6. The forms sent to the targeted over-user include the following varying standards of "medically unnecessary" usage:
 1. High medical usage (DPA 1937); 2. Having a high number of medical services (DPA 1937); 3. Your high usage (DPA 1937); 4. Unusual medical usage (DPA 1938); 5. Medical usage ... higher than usual (DPA 1938); 6. Potential abuse area (DPA 1935).

7. The question of "what process is due" is limited here to a discussion of the deficiencies in the notice, rather than the shape of the hearing, because plaintiffs have not challenged the latter issue.

*Camacho,* 562 F.Supp. at 1024. Assuming the Department will continue to computerize all relevant information regarding each recipient, due process can be satisfied by simply photocopying the computer printout and enclosing these papers with the notice forms already used. *See Dilda,* 612 F.2d at 1057 (requiring an identical remedy in a similar situation). We order the Department to include as part of the package sent to targeted overusers all the information mandated by this memorandum and order, especially its findings of condition and necessary care. Assuming this information will be organized in the same computer printouts referred to above, sending this information to the plaintiffs cannot possibly impose an undue burden.

The plaintiffs are concerned not only that the notices contain specific reasons for the Department's decision, but also that the issues on appeal are explicitly stated as required by *Camacho.* In *Camacho,* the plaintiffs challenged the Illinois Department of Labor's practice of issuing notice that identified one issue for appeal, and then raising other issues at the actual hearing. The court held that due process requires that the Department identify in its notice of appeal the *precise issues* to be raised at the hearing. *Camacho,* 562 F.Supp. at 1020.

In the present case the notices failed to identify the precise medical items or services at issue and failed to identify the standard by which such use has been judged. The first problem is remedied by attaching the computer printout to the notice and clearly identifying either on the printout or on the notice form which services or items are in question. The second problem is remedied by clearly identifying the term "medically necessary" as the legal standard, in such a way that a class member challenging the Department's decision will know that the medical services or items

identified as suspect are so because the Department considered them not medically necessary. Given our holding earlier in this opinion that the Department must make some preliminary finding on the correlation between usage and medical need, the form should identify the recipient's usage which the Department considers suspect, and then explain that the usage has been found medically unnecessary because the medical need doesn't justify it.[8]

### B. Notice of Reinstatement Procedures

The final due process issue in this case involves notifying plaintiffs of their right to request reinstatement to full benefits once their use has been restricted. As we held earlier in the opinion, the state must review the status of those whose benefits have been restricted within a year. However, at any point before that the system currently allows for a restricted recipient, or his or her doctor, to request reinstatement. The plaintiffs have described (and defendants admit to) the current procedures as follows. Either the recipient or the primary care physician must request an end to the restriction. If the recipient makes the request, his or her doctor must justify it by reviewing the recipient's current medical history and treatment plan. The Department then prepares a special evaluation which contains the above information and any other material the local office deems relevant, such as chronic loss of the Medicaid card, excessive emergency room usage or enrollment in a drug abuse program. The Department then decides whether or not to lift the restriction and sends the recipient a written notice.

No form sent or provided to restricted recipients informs them of these procedures for terminating restrictions. Because it is impossible to activate the process without knowing it exists, the court orders that when the Department notifies

8. The plaintiffs also challenge the forms the Department provides to overusers to give to their physicians when justifying their patients' medical usage. These forms suffer from the problem that the medical services in question are not identified, so the physician does not

know which services to justify. The problem is easily remedied by providing the physician with the same information we are requiring the Department to provide the targeted overusers and we so order the Department to do so.

the recipient that his or her card will be restricted, the Department also clearly indicate that the recipient can request a termination of the restriction by following the procedures outlined above.

### V. SUMMARY

In sum, the court finds the Department's implementation of the Medicaid statutory provisions at issue in this case woefully inadequate for both the substantive and procedural reasons the plaintiffs have identified. However, the court has not taken the step of detailing a remedial plan at this stage because of the flexibility the statute gives the state to determine or design its own implementation strategy. The court directs the defendants to submit a remedial plan within 60 days.

Plaintiffs' motion for summary judgment is granted in substantial part, except for a finding that restricting an overuser to one primary care physician does not *per se* violate 42 U.S.C. § 1396n(a)(2)(A).